PUBLIC CITIZEN, et al.

v.

FEDERAL TRADE
COMMISSION, Appellant.

No. 88–5209.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 30, 1989.
Decided March 14, 1989.

Lawrence DeMille–Wagman, Attorney, F.T.C., with whom Robert D. Paul, Gen. Counsel, and Ernest J. Isenstadt, Asst. Gen. Counsel, F.T.C., Washington, D.C., were on the brief for appellant.

David C. Vladeck, with whom Alan B. Morrison, Washington, D.C., was on the brief for appellees.

James G. O'Hara, with whom Garret G. Rasmussen, Washington, D.C., was on the brief for The Smokeless Tobacco Council, Inc. as amicus curiae, urging the judgment of the District Court be vacated.

Kathryn A. Oberly, Washington, D.C., also entered an appearance for amicus curiae, The Smokeless Tobacco Council, Inc.

Paul D. Kamenar, Washington, D.C., entered an appearance for amicus curiae, Washington Legal Foundation.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and GREENE *, District Judge.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

In 1986, Congress passed the Comprehensive Smokeless Tobacco Health Education Act, 15 U.S.C. §§ 4401–4408 ("Smokeless Tobacco Act" or "Act"). The Act established a comprehensive scheme under which producers and distributors of smokeless tobacco products (*e.g.*, snuff and chewing tobacco) are required to include health warnings on all smokeless tobacco packages, as well as in advertisements for the product. *See* 15 U.S.C. § 4402(a)(1), (2). Appellant Federal Trade Commission ("FTC" or "Commission"), which was charged with implementing certain aspects of the Act, published final regulations in 1986 that, *inter alia*, expressly exempted "utilitarian objects for personal use, such as pens, pencils, clothing, or sporting goods," from the Act's general warning requirements. According to one industry representative, these items include "the tee shirts, hats, tote bags, and the like that manufacturers provide with their identifying brandnames and logos and sometimes brief associated messages." Joint Appendix ("J.A.") at 76 (comment to the FCC by Terry Burns, Executive Director of the National Association of Tobacco Distributors). Appellees Public Citizen, the American Cancer Society, the American Heart Association, the American Lung Association, and the American Public Health Association ("appellees" or "the organizations") brought suit in district court, alleging that the FTC's decision to exempt utilitarian items that bear product logos or selling

messages from Congress' comprehensive warning scheme was contrary to the express provisions of the Act, and that the Commission's decision was in any event arbitrary and capricious. The district court agreed with the organizations on both grounds, ordering the FTC to delete the exemption from its regulations.

The FTC did not challenge the organizations' standing before the district court, and it has remained silent on the issue here. The Smokeless Tobacco Council, Inc., however, has made an appearance as *amicus curiae*, urging this court to find that the organizations lack standing to maintain this action. For the reasons that follow, we conclude that the organizations have met the requirements for standing. On the merits, we agree with the district court that the FTC's decision to exempt utilitarian items from the Act's warning requirements was contrary to the clear mandate of the Act, and we therefore affirm the district court's judgment.

## I. BACKGROUND

Congress enacted the Smokeless Tobacco Act in 1986 as a response to two alarming developments. The first involved the growing body of evidence that use of smokeless tobacco products such as snuff and chewing tobacco presents serious health hazards. Like tobacco that is smoked, smokeless tobacco contains nicotine and is addictive. *See* S.Rep. No. 209, 99th Cong., 2d Sess. 3 (1985), *reprinted in* 1986 U.S.Code Cong. & Admin. News 7, 9 ("Senate Report"). In addition, medical studies have linked smokeless tobacco use to "certain alterations in the tissues of the mouth, such as gingival recession (recession of the gums), periodontal bone destruction, and tooth abrasion." *Id.* Perhaps most significant, there is evidence of a correlation between smokeless tobacco use and the development of precancerous lesions, such as leukoplakia, which can convert to squamous cell carcinomas. *Id.*

---

* The Honorable Harold H. Greene, of the United States District Court for the District of Colum-

bia, sitting by designation pursuant to 28 U.S.C. § 292(a).

The second development, perhaps even more troubling because of the multiplication of risks it portends for the future, involves recent dramatic increases in the number of people, particularly young people, who use smokeless tobacco.[1] During the first part of this century, smokeless tobacco use was slight compared to other forms of tobacco consumption, and was concentrated among a fairly small segment of the population. In fact, smokeless tobacco consumption was on the decline between 1900 and 1962. *See* Senate Report at 3–4. This trend has reversed in recent years. Since 1974, the use of smokeless tobacco has risen by a reported annual rate of 11 percent. *See Tobacco Issues: Hearings Before the Subcommittee on Health and the Environment of the House Committee on Energy and Commerce,* 99th Cong., 1st Sess. 260 (1985) ("House Hearings") (statement of LaSalle Leffall, Jr., M.D., citing National Cancer Institute estimates). On both the House and Senate floors, legislators cited statistics showing that nationally anywhere from 10 to 22 million persons are regular users of smokeless tobacco. *See* 132 Cong.Rec. 1332 (1986) (statement of Rep. Richardson); *id.* at 1858–59 (statement of Sen. Hatch); *id.* at 1961 (statement of Sen. Lugar).

The surge in the popularity of smokeless tobacco among young people was clearly of particular concern to the legislators who sponsored the Smokeless Tobacco Act. One Texas study presented to Congress showed that among regular users, 88 percent started chewing or "dipping" before the age of 15, and 55 percent started before the age of 12. *See* House Hearings at 124–31 (statement of Elbert D. Glover, Ph. D.). Indeed, another study in Oklahoma revealed that 33 percent of ninth grade boys and 13 percent of third grade boys

had tried smokeless tobacco products. *See, e.g.,* 132 Cong.Rec. 1858 (statement of Sen. Hatch). Moreover, Congress determined that many of these persons turn to smokeless tobacco in the mistaken belief that it is a safe alternative to cigarette smoking.

To respond to these disturbing developments, Congress enacted a comprehensive scheme "to make the public aware of the adverse health consequences of using smokeless tobacco products." 132 Cong. Rec. 1329 (1986) (statement of Rep. Waxman). The Smokeless Tobacco Act has several parts, including provisions for public education, *see* 15 U.S.C. § 4401, and ingredient reporting, *see* 15 U.S.C. § 4403. The Act's most striking component, however, is its comprehensive warning scheme. All smokeless tobacco packages must now contain one of three prescribed health warnings.[2] In addition, the Act imposes a blanket requirement, subject to one express exception, that advertising for smokeless tobacco products must also contain the warnings:

> It shall be unlawful for any manufacturer ... of smokeless tobacco products to advertise or cause to be advertised (other than through the use of outdoor billboard advertising) within the United States any smokeless tobacco product unless the advertising bears, in accordance with the requirements of this chapter, one of the labels required by paragraph (1).

15 U.S.C. § 4402(a)(2). The Act banned television and radio advertising altogether. 15 U.S.C. § 4402(f).

The FTC was directed under the Act to develop requirements as to the size, color, and typeface of the required warnings, and was given responsibility for determining

---

1. *See, e.g.,* Squier, "Smokeless Tobacco and Oral Cancer: A Cause for Concern?," *reprinted in Tobacco Issues: Hearings before the Subcommittee on Health and the Environment of the House Committee on Energy and Commerce,* 99th Cong., 1st Sess. 84 (1985) (suggesting that use by young people is particularly disturbing because "[e]arly addiction could ensure exposure for a considerable period of time, and the data suggest that the risk of developing cancer increases markedly with long-term exposure").

2. The language of the three warnings, which must be rotated, is contained in the Act:
  "WARNING: THIS PRODUCT MAY CAUSE MOUTH CANCER";
  "WARNING: THIS PRODUCT MAY CAUSE GUM DISEASE AND TOOTH LOSS";
  "WARNING: THIS PRODUCT IS NOT A SAFE ALTERNATIVE TO CIGARETTES".
  15 U.S.C. § 4402(a)(1).

the best placement of the warnings on packages. 15 U.S.C. § 4402(b)–(c).

In July 1986, the FTC published a notice announcing proposed regulations and raising several particular questions for commenters to address. Among these questions, the Commission signalled its skepticism about the appropriateness of requiring health warnings on "utilitarian objects intended for personal use." *See* 51 Fed. Reg. 24,375, 24,379 (1986). In response to its invitation to comment, the Commission received several submissions directly addressing the issue of utilitarian objects. The Act's chief sponsors in the Senate (Sens. Hatch, Kennedy, and Lugar) and in the House (Reps. Synar and Waxman) submitted statements expressing their shared view that Congress had not intended to grant the FTC the power to create this sort of exemption to the Act. *See* J.A. at 35–36, 37–40 ("Congress could not have been more clear that the *only* form of advertising exempted from the requirement to display health warnings was outdoor billboards." (emphasis in original)). Of the comments discussing utilitarian items, only those submitted by two representatives of the smokeless tobacco industry supported the proposed exemption. *See* J.A. at 75–76, 77–78. These commenters relied primarily on the fact that warnings on utilitarian items had never been required in the cigarette context,[3] and their sense that smokeless tobacco products should not "be treated less favorably than cigarettes in this respect." J.A. at 78 (comment of the Smokeless Tobacco Council).

The FTC promulgated final regulations that were published on November 4, 1986, *see* 51 Fed.Reg. 40,005, which purported to implement the warning requirement for advertising subject to the following exceptions:

This requirement is not applicable to company and divisional names, when used as such, to signs on factories, plants, warehouses, and other facilities related to the manufacturer or factory storage of smokeless tobacco, to corporate or financial reports, to communications to security holders and others who customarily receive copies of these communications, to employment advertising, to advertising in tobacco trade publications, or to promotional materials that are distributed to smokeless tobacco wholesalers, dealers, or merchants, but not to consumers. *This requirement does not apply to utilitarian objects for personal use, such as pens, pencils, clothing or sporting goods*. In addition, this requirement does not apply to shelf-talkers and similar product locators with a display area of 12 square inches or less.

16 C.F.R. § 307.4(b) (1988) (emphasis added). The FTC offered the following explanation for its decision to exempt utilitarian objects:

[A]lthough the Commission understands that certain types of promotional activities, like the distribution of utilitarian objects, are intended to increase brand awareness, advertising and other promotional expenditures are commonly distinguished [citing the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1337(b) (1982), which refers to "methods of cigarette advertising and promotion"]. Moreover, there are practical problems in putting health warnings on many of the utilitarian objects distributed by the smokeless tobacco industry, such as golf balls and cuspidors. In addition, the Commission is sensitive to the need to avoid diminishing the seriousness of the required warnings by mandating their display in absurd situations. Since requiring the display of warnings on utilitarian items may be counterpro-

---

3. The exemption for utilitarian items bearing promotional messages for *cigarettes* was the product of a consent order entered into by the FTC and major cigarette manufacturers in 1972. *See* In re Lorillard, 80 F.T.C. 455, 460–64 (1972), *reaffirmed in United States v. Lorillard,* No. 76–Civ. 814 (JMC) (S.D.N.Y. July 13, 1981), at 8–9. These authorities distinguished "non-media advertising and promotional materials offered or given to consumers" from the cigarette statute's term "advertising." Congress signalled its intent to retain this understanding in the *cigarette* context when it passed the Cigarette Act in 1984. H.R.Rep. No. 805, 98th Cong., 2d Sess. 17 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin. News 3718, 3730.

ductive to the [Act's] goal of providing meaningful information concerning the health risks associated with smokeless tobacco use, the benefits of requiring the display of warnings on these items is at best *de minimis.*

51 Fed.Reg. at 40,007.

Appellees Public Citizen, American Cancer Society, American Heart Association, American Lung Association, and American Public Health Association challenged the italicized portion of the regulations. The organizations sought declaratory and injunctive relief pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2). According to their original complaint, the organizations have a combined membership of approximately three million, J.A. at 5–6, and are broadly engaged in health advocacy. Although many of their members are health professionals, it appears that some members are not. The district court did not stop to analyze standing, but rather went straight to the merits, granting summary judgment for these health organizations on the grounds that the FTC lacked the authority under the statute to grant the exception for utilitarian items and that the exception was in any event arbitrary and capricious. *See Public Citizen v. FTC,* 688 F.Supp. 667 (D.D.C.1988).

## II. STANDING

Before proceeding to the merits of the case, this court must satisfy itself that the parties have standing to raise the challenges they advance. *See Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986).

Organizations like appellees may only pursue an action in their capacity as representatives of their members [4] if they meet the test summarized by the Supreme Court in *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977) (reaffirmed recently in *International Union, UAW v. Brock,* 477 U.S. 274, 288–90, 106 S.Ct. 2523, 2532–33, 91 L.Ed.2d 228 (1986)):

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

As to items (b) and (c), appellees are organizations whose purposes are clearly "germane" to the interests at issue, and the claims advanced by appellees do not require the participation of individual members.[5] We pause only on the issue of whether appellees' members "would otherwise have standing to sue in their own right." Stated another way, the critical question in this case is whether the organizations have satisfactorily "allege[d] that [their] members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211–12, 45 L.Ed.2d 343 (1975) (citation omitted) (quoted in *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. at 342, 97 S.Ct. at 2441).[6]

---

**4.** Because we ultimately conclude that Public Citizen and the other organizations have standing in their capacities as representatives of their members, we do not address the organizations' separate contention that they have standing in their own capacity, as organizations that are themselves "adversely affected" by the FTC's actions.

**5.** *Cf. International Union, UAW v. Brock,* 477 U.S. at 287–88, 106 S.Ct. at 2531–32 (finding that a suit which raises a pure question of law and which seeks relief that is not dependent on the individualized facts of individual cases meets the third prong of the *Hunt* test).

**6.** The Smokeless Tobacco Council's *amicus* brief states (twice) that "plaintiffs must show a specific injury to their members *qua* members of the plaintiff organizations." Amicus Br. at 20 (emphasis omitted); *see also id.* at 22–23 (plaintiffs "must show that there exists a special and differentiated injury to their members *qua* members"). This is not the law. There is no requirement that persons be *more* entitled than others to sue in their own capacity in order for the organizations of which they are members to sue on their behalf. Rather, they must simply "otherwise have standing." *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. at 343, 97 S.Ct.

**1546**

Because the issue of standing was not challenged below, we must base our decision on the uncontested factual allegations contained in the organizations' original complaint. Claiming that their combined memberships total over three million persons, *see* Complaint at ¶¶ 3–7, J.A. at 5–7, the organizations alleged that

[s]ome of plaintiffs' members and their members' families, have used, or may use, smokeless tobacco products because they are not fully aware of the serious health risks that are associated with the use of smokeless tobacco products. Unless this Court enjoins the FTC from continuing to permit the distribution of promotional materials that do not bear the statutorily required warning labels, plaintiffs, their members and families, and other members of the public will be irreparably injured, and will be placed in jeopardy of using smokeless tobacco products, without an appreciation of the adverse health effects that are associated with such products.

*Id.* at ¶ 13, J.A. at 9. The organizations thus argue that they have standing in their representational capacity because their *members* would have standing in their individual capacities, by virtue of the injuries they and their families suffer when they are denied the comprehensive warning scheme that Congress' Act gave them the right to receive.[7]

Despite the efforts of some of our greatest jurists, standing jurisprudence defies pat generalizations. We have previously noted that as a result, an inquiry into standing "is a highly case-specific endeavor." *National Wildlife Federation v. Hodel*, 839 F.2d 694, 703 (D.C.Cir.1988). The starting point in this case is § 10 of the Administrative Procedure Act, 5 U.S.C. § 702, which instructs us that standing will be accorded parties who can show that they have been "adversely affected or aggrieved by agency action within the meaning of a relevant statute." The Supreme Court has been unwilling to take a narrow view of the APA's " 'generous review provisions,' " *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 156, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51, 75 S.Ct. 591, 594, 99 L.Ed. 868 (1955)), and it has interpreted the provision so as to effectuate the APA's broadly remedial purpose. *See Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 395, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987). The Court has further outlined the (necessarily interrelated) factors comprising the constitutional dimensions of the standing requirement:

[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority [1] to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury [2] "fairly can be traced to the challenged action" and [3] "is likely to be redressed by a favorable decision."

at 2441. The appropriateness of an organization's taking on the litigation is in turn safeguarded, not by its members' "special" injury, but by the Supreme Court's requirement that the subject of the litigation be germane to the organization's purposes. *Id.* Accepting the Council's arguments for special injury would discourage organizations from suing in their representative capacity, when the Supreme Court has only recently addressed the benefits that such organizations can bring to litigation. The Court noted in particular that "an association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital ... [which] can assist both courts and plaintiffs." *International Union, UAW v. Brock*, 477 U.S. at 289, 106 S.Ct. at 2533.

**7.** In the Smokeless Tobacco Council's *amicus* brief to this court, the Council attempts to re-

characterize the injury to the organizations' members, emphasizing what it perceives to be the unlikelihood that members and their families will ultimately partake of smokeless tobacco. This challenge simply misperceives the true injury at stake in *this* case. The injury alleged by the organizations in this action is qualitatively different from the injuries in, for example, a traditional tort suit for compensatory damages. It resides not in what might be called the "speculative" chance that members will in fact become snuffdippers, or that their health will suffer as a result; rather, it arises from the more *certain* charge that they are being deprived of information and warnings that will be of substantial value to them and to which they are legally entitled. *See generally* Sunstein, Standing and the Privatization of Public Law, 88 Colum.L.Rev. 1432 (1988).

*Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1979)).[8]

In this case, the causal chain between the challenged action and the posited injury is not seriously attenuated, and thus the latter two issues identified by the *Valley Forge* Court are not at issue.[9] The organizations have alleged that the FTC's decision to exempt utilitarian items from the broad warning requirements of the Act will lead smokeless tobacco producers to continue to distribute such items containing their logos without health warnings, which in turn will directly deprive members and their families of valuable warnings to which Congress allegedly determined they were entitled. Moreover, the organizations' challenge, if successful, will result in the FTC *requiring* the inclusion of warnings on utilitarian items. The causal links in this chain are therefore quite clear.[10] The real question in this case is whether the deprivation of the warnings on utilitarian items constitutes a constitutionally cognizable "injury" at all.[11]

This court has had several occasions to survey the relevant Supreme Court case law, and has explained that for standing purposes, "[t]he injury or threat [alleged by plaintiffs] must be 'distinct and palpable,' 'concrete,' ' "direct," ' and 'both "real and immediate," not "conjectural" or "hypothetical." ' " *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1378 (D.C.Cir.1984) (citations omitted). Moreover, we note that the requisite injury cannot be to merely "abstract" interests. *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976); *see also Diamond v. Charles*, 476 U.S. 54, 62, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986) (" 'The exercise of judicial power ... can so profoundly affect the lives, liberty, and property of those to whom it extends,' that the decision

---

**8.** The Supreme Court has put "a gloss on the meaning of § 702," *Clarke v. Securities Industry Ass'n*, 479 U.S. at 395–96, 107 S.Ct. at 755, by requiring, in addition to a showing of injury in fact, that "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing*, 397 U.S. at 153, 90 S.Ct. at 830. As articulated in this circuit, the zone of interests test only " 'requires some indicia—however slight—that the litigant before the court was intended to be protected, benefited or regulated by the statute under which suit is brought.' " *Autolog Corp. v. Regan*, 731 F.2d 25, 29 (D.C.Cir.1984) (quoting *Copper & Brass Fabricators v. Department of the Treasury*, 679 F.2d 951, 952 (D.C.Cir.1982)). Here, it is clear that the interests that the organizations seek to protect—members' interests in receiving the warnings—are located at the very center of the zone of interests protected by the Act.

**9.** This case is an example of what we have previously labelled "third-party" cases, inasmuch as the alleged injury does not technically flow directly from the challenged (typically governmental) action, but instead must be traced through the resultant actions of intermediary parties before it can be causally linked to plaintiff's alleged injury. *See Wilderness Society v. Griles*, 824 F.2d 4, 11–12 (D.C.Cir.1987). In

many third-party cases, where the causal links are attenuated, the court's focus is drawn to the second and third questions identified by the *Valley Forge* Court, traceability and redressability. For example, in a three-party case where the alleged injury involves access to land, this court has been cautious to scrutinize "whether the plaintiff's future conduct will occur in the same location as the third party's response to the challenged governmental action." *Wilderness Society v. Griles*, 824 F.2d at 12. But when the links of the chain follow more naturally and necessarily—as where the government's decision to *require* an action by private parties will cause them to act as directed—the second and third factors can be presumed satisfied.

**10.** It is this factor that distinguishes this case from "consumer standing," "where injury is alleged to occur within a market context [and] the concepts of causation and redressability become particularly nebulous and subject to contradictory, and frequently unprovable, analyses." *Common Cause v. Department of Energy*, 702 F.2d 245, 251 (D.C.Cir.1983) (footnote omitted).

**11.** *See Wilderness Society v. Griles*, 824 F.2d at 12 ("When personal injury *is* at issue in a three-party case, it usually depends upon how likely it is that the third party's response to the challenged governmental action will injure the plaintiff *at all*." (emphasis in original)).

to seek review must be placed 'in the hands of those who have a direct stake in the outcome.'" (quoting *Valley Forge,* 454 U.S. at 473, 102 S.Ct. at 759, and *Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 1368–69, 31 L.Ed.2d 636 (1972))). At the same time, it is well established that an injury need not be to economic or other comparably tangible interests, *see, e.g., Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972), nor need it be "significant[ ]"—an "identifiable trifle" will do. *United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973) (quoting Davis, Standing: Taxpayers and Others, 35 U.Chi. L.Rev. 601, 603).

An infringement of an individual's statutory right to receive information has sufficed in other contexts to endow parties with standing. In *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), for example, the Supreme Court found that individuals who were denied truthful information about housing from private sources were denied a legal right created by Congress in § 804(d) of the Fair Housing Act of 1968, 42 U.S.C. § 3604(d).[12] Recognizing that " '[t]he actual or threatened injury required by Art. III may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing," ' " *Havens Realty,* 455 U.S. at 373, 102 S.Ct. at 1121 (quoting *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536 (1973))), the Court held that a person who received "a misrepresentation made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against," *id.*

Similarly, in *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the Supreme Court addressed the question whether a suit brought by "prescription drug consumers who claim that they would greatly benefit if the prohibition [on the advertising of drug prices] were lifted" could properly be maintained. *Id.* at 753, 96 S.Ct. at 1821. The plaintiffs in that action, including two nonprofit organizations who had many members that it claimed were prescription drug users, *see id.* n. 10, were found to have standing because the Court found that the information would be of value to the organizations' members. Although the substantive issues in that case were quite different from those in the present action, the analytical structure of the standing argument is the same in both cases. There, the Court held that the plaintiff-organizations' members, for whom the information would be of direct value, could maintain an action when they were not receiving the information in the manner in which they claimed they were legally entitled to receive it. Here, the organizations similarly argue that members and their families are being deprived of warnings to which they are legally entitled.[13]

---

**12.** We *do not* address the applicability *vel non* of the *Havens* Court's analysis of organizational standing. Rather, for purposes of this case, the only relevant portion of the *Havens* opinion is that dealing with the injury suffered by *individuals* who are denied information to which they are statutorily entitled.

**13.** Plaintiffs who bring actions under the Freedom of Information Act (FOIA) also clearly have standing merely by virtue of the fact that they have been denied information they have requested. *See Rushforth v. Council of Economic Advisers,* 762 F.2d 1038 (D.C.Cir.1985); *see also Brandon v. Eckard,* 569 F.2d 683, 687–88 (D.C.Cir.1977) ("FOIA does not discriminate among persons seeking access to materials on grounds of their particular interests in the requested information...." (footnote omitted).

It is instructive for the purposes of this case that the Supreme Court has expressly ruled that persons seeking to vindicate a statutory right to information have standing even if they know or should know that the untruthful information they receive is false, *see Havens Realty,* 455 U.S. at 374, 102 S.Ct. at 1122, and even if the information is available to them through other channels, *see Virginia Board,* 425 U.S. at 757 n. 15, 96 S.Ct. at 1823 n. 15. Factors such as these do "not negate the simple fact of injury within the meaning of" the relevant statute. *Havens Realty,* 455 U.S. at 374, 102 S.Ct. at 1121 (citing *Pierson v. Ray,* 386 U.S. 547, 558, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967), and *Evers v. Dwyer,* 358 U.S. 202, 204, 79 S.Ct. 178, 179, 3 L.Ed.2d 222 (1958) (per curiam)).

The Smokeless Tobacco Council, Inc., appearing as *amicus curiae*, argues that this deprivation of information is not a sufficient injury to give appellees' members standing.[14] The Council's first contention is that it cannot be shown how the absence of the warnings on utilitarian items promoting smokeless tobacco products will appreciably injure anyone by placing them in "jeopardy" of purchasing snuff or chewing tobacco. The Council notes that the FTC *has* required warnings on all other print advertising, and reminds us that the warnings will also appear on all packages of smokeless tobacco. "The impact of the warnings that *are* given," concludes the Council, "clearly dwarfs the altogether speculative impact that requiring additional warnings on utilitarian items might have." Amicus Br. at 21.

We must reject the Council's argument. First, this contention is nothing more than an effort to bootstrap standing analysis to issues that are controverted on the merits. In effect, the Council urges this court to find that *no one* would have standing to challenge the FTC's finding that the benefits of warnings on utilitarian items are minimal, *because* the FTC found that the benefits are minimal. This reasoning falls into the familiar trap of confusing the merits of a case with the threshold requirement of standing to present a challenge. In this action, we cannot assume at the threshold that the FTC will prevail on the merits in order to close the courthouse door

to all potential litigants. Rather, we take the opposite tack. In enacting the *Comprehensive* Smokeless Tobacco Health Education Act of 1986 (emphasis added), Congress has clearly signalled its conclusion that to attack the growing problem of smokeless tobacco consumption, especially among adolescents, warnings on packages would *not* be enough to get the message across that dipping and chewing are dangerous endeavors. Contrary to the Smokeless Tobacco Council's apparent assumption that a one-time message would somehow suffice, Congress has determined that only a comprehensive approach will adequately address the problem: rather than settling for the minimum possible, Congress' scheme appears quite clearly designed to guarantee that each time one sees a smokeless tobacco product promoted in a favorable light, there will appear along with it the omnipresent reminder of the dangers associated with its use.[15] This determination is consistent with our own understanding of the benefits of repeated warnings: only constant reminders of the health dangers associated with smokeless tobacco will effectively offset the persuasive power of the industry's advertisements promoting its use. For standing purposes, we therefore credit this congressional determination, and give it great weight in concluding that a comprehensive scheme is necessary to protect young people from the very "jeopardy" alleged in appellees' complaint.[16] *Cf. Center for Auto Safety v.*

14. The FTC's filings to this court are silent on the issue of standing.

15. We also recognize the force of appellees' contention that in the case of adolescents, utilitarian items might be among the *most* effective forms of promotion. *See* Br. for Appellees at 45; *see also* J.A. at 52 (comment to the FTC by the Coalition on Smoking OR Health, noting that "smokeless tobacco manufacturers rely much more heavily on promotional practices than do cigarette manufacturers and that these promotional marketing efforts are a major part of the smokeless tobacco industry's effort to expand its market to new users, most of whom turn out to be children"). On the whole, adolescents are less likely than adults to read newspapers and magazines that contain smokeless tobacco ads with warnings. Moreover, warnings on packages will often come too late for adolescents, inasmuch as the critical moment of deci-

sion for that age group may come not with the actual purchase of smokeless tobacco, but earlier when a young person decides to accept a chew from his friends.

16. In analyzing questions of standing, we have frequently noted the propriety of judicial deference to congressional judgments of likely cause-and-effect relationships. *See, e.g., National Wildlife Federation v. Hodel,* 839 F.2d at 708–09 (Congress' suggestion that the deletion of minimum standards in the mining context might lead to lessened protection is just the sort of legislative assessment which courts can credit in making standing determinations); *Autolog Corp. v. Regan,* 731 F.2d 25, 31 (D.C.Cir.1984); *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 811–12 (D.C.Cir.1983), *cert. denied,* 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); *Animal Welfare Institute v.*

*National Highway Traffic Safety Administration,* 793 F.2d 1322, 1334–35 (D.C.Cir. 1986) (finding causation because "[i]f setting a higher standard cannot result in vehicles with increased fuel efficiency, then the entire regulatory scheme is pointless.").

The Council also argues that the health-conscious members of appellee organizations are on the whole distinctly *less* likely to be put in jeopardy by the lack of warnings on utilitarian items. Of course, the standing inquiry does not depend on "averages" or on the injuries suffered by a population "as a whole." Rather, the test that has evolved for determining whether an organization may sue in its representational capacity requires the court to focus on whether *individual* members of the organization have suffered *or will suffer* the requisite injuries.[17] And while we agree that many of appellees' members surely know of the dangers that attend smokeless tobacco use, this does not undermine the organizations' contention that many other members (including those who are not health professionals) are nevertheless injured when they are denied these warnings. Evidence before the House subcommittee in which earlier versions of the Act originated reveals that "[a]dvertisements for smokeless tobacco imply that the habit is less harmful than smoking, and unfortunately, this impression is common among the public *and even among health professionals.*"[18] Appellees' members who share this impression are indeed injured by their failure to receive warnings.

Moreover, members who have adolescent or even pre-adolescent children—the particular targets of the Act—would also have standing to sue in their role as parents. The injury that is sustained by children who do not receive the health warnings is precisely what Congress sought to eliminate in enacting the Act. As in other contexts, the parents of at-risk children are the ones that we might otherwise *expect* to bring suit. *See generally* 13 C. Wright, A. Miller, & H. Cooper, Federal Practice and Procedure § 3531.9 (2d ed. 1984) (parents may maintain litigation that rests directly on the standing of the children themselves). Therefore, the organizations have the derivative authority to pursue the action on the parents' behalf. And even beyond the injuries to children that can pass indirectly to parents, a parent has his or her own direct, legally cognizable interest in preserving the highest level of health for his or her child. *See Parham v. J.R.,* 442 U.S. 584, 600–04, 99 S.Ct. 2493, 2503–05, 61 L.Ed.2d 101 (1979) (discussing "the parents' interest in and obligation for the welfare and health of the child"). *Cf. Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (parents' right to direct child's education); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (parents' right to direct the upbringing and education of their children); *Wisconsin v. Yoder,* 406 U.S. 205, 233, 92

---

*Kreps,* 561 F.2d 1002, 1010 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978). Deference in this context surely does not mean blind obedience. *See Dellums v. Nuclear Regulatory Comm'n,* 863 F.2d 968, 978–79 (D.C.Cir.1988) (opinion of Silberman, J.) (noting that "we have never as a court held that we are bound to accept a congressional appraisal of the effect of its product"); *see also id.* at 980–82 (Senior District Judge Milton Pollack, concurring *dubitante* ) ("I ... am somewhat uncertain about the proper resolution of the standing problem in this case."); *id.* at 982–87 (Ruth Bader Ginsburg, J., dissenting as to standing) (agreeing with the opinion of Silberman, J., that "courts are not *bound* to accept anything and everything Congress labels its findings" (emphasis in original), but suggesting that "[w]hen the redressability inquiry involves a question of predictive fact regarding matters outside the realm of judicial expertise, ... courts should be reluctant to contradict the judgment of Congress, doing so only upon a showing that Congress' judgment does not stand the test of rationality.").

**17.** *See Central & Southern Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301, 312 (D.C. Cir.1985) (quoting *Warth v. Seldin,* 422 U.S. at 511, 95 S.Ct. at 2211) (noting that the requirement of injury in fact for organizational standing is satisfied if the association's members, "'or any one of them,* are suffering immediate or threatened injury as a result of the challenged action[']" (emphasis added by the *Central & Southern* court)), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985).

**18.** House Hearings at 80–81 (article by Christopher A. Squier, M.A., Ph.D.) (emphasis added).

S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972) (parents' right to direct the religious upbringing of their children); *cf. also Johnson v. Stuart,* 702 F.2d 193, 196 (9th Cir.1983) (recognizing parents' standing to challenge the selection of school texts because parents "may assert claims of constitutional violation primarily affecting their children's education").

The Smokeless Tobacco Council's final set of arguments focuses on the level of proof that the organizations in this action must provide in order to meet their burden of showing injury to their members and their members' families. This court has previously held that plaintiffs in actions such as this must show more than a generalized grievance; they must also "allege that ... their members will suffer particularized injury" from the challenged actions. *Wilderness Society v. Griles,* 824 F.2d at 15. "Otherwise," we explained, "we cannot be certain enough that the plaintiff will himself be among the injured." *Id.*

The organizations' allegations in this suit satisfy us that the injuries discussed above are real and they afflict the organizations' members. To make out their case, the organizations need show (to take the least demanding but nonetheless adequate approach) no more than that they sue on behalf of members who have adolescent children who will be exposed to the promotional messages conveyed by utilitarian items. Common sense compels the conclusion that among the organizations' three million members, there are many who have adolescent children, and many of those children are surely males, the subgroup Congress identified as most at risk. Moreover, the legislative record leading to the passage of the Act suggests that the upward trend in smokeless tobacco use is not confined to any particular region, but rather stretches across geographical and social boundaries.[19] In addition, the very nature of promotional campaigns—particularly those involving T-shirts, jackets, baseball caps, and other items containing logos and/or slogans that are designed to be worn/displayed in *public*—is to seek broad dissemination of a message, with the *aim* of reaching the universe of potential purchasers. Thus, we are satisfied that in this case there exists the necessary "nexus" between the allegedly injurious items and the persons suffering injuries.[20]

The Council nevertheless argues that because the organizations have not specified the *identity* of particular members who will be injured, they have not sustained their burden of showing that the alleged injury is not merely "'conjectural' and 'hypothetical.'" Amicus Br. at 22 (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). But this argument misconceives the crucial inquiry for standing: while it will often be expedient (if not necessary) to identify particular individuals in order to show with reasonable certainty that there will in fact be a real injury, the "identity" of those injured is not the ultimate goal. *See National Wildlife Federation v. Burford,* 835 F.2d 305, 313 (D.C.Cir.1987) (rejecting the argument that an organization lacks standing when "it has not identified any specific member who uses a particular parcel of

19. For example, Elbert D. Glover, Ph.D., Associate Professor at East Carolina University, reported the results of a "National Collegiate Smokeless Tobacco Survey," which does reveal some variations in use levels according to region (ranging from a high of 28 percent for college males in the South Central [Oklahoma] region to a low of 15 percent for college males in the Northeast [Connecticut]). *See* House Hearings at 131. Nevertheless, the study reveals that no region is without some significant level of smokeless tobacco use among the young.

20. This factor—the purposeful dissemination of the message to the public at large—distinguishes this case from other cases, such as environmental suits, where without an express linkage there is no reason to believe that *any* connection exists between an individual (or group of individuals) and a particular park or tract of land. In these latter cases, parties bear a qualitatively different burden to show injury in fact. *See, e.g., National Wildlife Federation v. Hodel,* 839 F.2d at 707 ("We ... are satisfied that ... NWF's affiants live in communities where surface mining operations have occurred."). When the relevant persons are targeted to receive the putative "injury," the nexus is clearly established.

land").[21] Rather, the identity of individual members is only a means to an end, and it should not be confused with the real purpose of the inquiry—that is, for the court to be satisfied that the requisite injury really has occurred or will occur in the future to members of the organizations, thereby endowing the organizations with standing to sue as representatives, not simply as groups with a longstanding "interest in a problem." *See Sierra Club v. Morton,* 405 U.S. at 739, 92 S.Ct. at 1368.[22]

In this case, it is not necessary for us to know the names of injured persons in order to be assured beyond any reasonable doubt that they exist, and that the organizations to which they belong may pursue this action on their behalf. Indeed, because of the peculiar nature of the injury alleged—ignorance—it would, as the Council points out, be logically impossible to expect individuals both to identify themselves *and* to claim plausibly that they are injured by their own ignorance; this would be a self-defeating proposition, for anyone with the self-awareness to come forward would almost by definition not be among the group for whom the denial of the warning would result in the sort of "distinct and palpable"

injury the Constitution requires. Moreover, to require individual parents to swear in affidavits that their children are ignorant of the risks associated with smokeless tobacco would be equally absurd, for one must wonder why a concerned parent who would go to the trouble of participating in this litigation would not also spend a few moments *curing* their children's ignorance.[23] In effect, this "ignorance," while a cognizable injury, might be seen as dew on grass which, when exposed to the light of day, evaporates: every time the organizations bring in a person who is not aware of the risks, he *becomes* aware of the risks, and standing disappears.

We do not feel constrained to pursue the illogic of this course even further and conclude that *no one* would ever have standing to challenge any denial of information. Rather, in this case we are satisfied that the requisite injuries to members have been adequately demonstrated and we see no reason to bar the organizations from suing on their behalf.[24] It is an accepted peculiarity of organizational litigation that the individuals who have "standing"—*i.e.,* not those who have actually brought suit, but

**21.** *See also New York State Club Ass'n, Inc. v. City of New York,* —— U.S. ——, 108 S.Ct. 2225, 2232, 101 L.Ed.2d 1 (1988) ("It does not matter what specific analysis is necessary to determine that the members could bring the same suit, for the purpose of the first part of the *Hunt* test is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation.").

**22.** Hence, in *Warth v. Seldin,* 422 U.S. at 502, 95 S.Ct. at 2206, for example, the Supreme Court ruled that absent a showing of personal injury by petitioners, it would not suffice to allege "that injury has been suffered by other, unidentified members of the class ... which they purport to represent"; the point was not that the identity of other persons *per se* was important, but rather that without specific identifications, the Court was dubious whether they in fact existed.

**23.** It is conceivable that parents could submit variations on such an affidavit—*e.g.,* to the effect that they have told their children of the risks associated with smokeless tobacco but that the children do not seem to listen, or that their children pick up conflicting messages from oth-

er sources including utilitarian items bearing promotional messages. But we need not rely on individual parents to share this information with us: Congress itself has identified the need among our youth for a comprehensive warning scheme that would come in addition to education they receive from other sources, including the separate provisions for education contained in the Act. *See* 15 U.S.C. § 4401.

**24.** The Council intimates that members of health organizations such as appellees are somehow less entitled to sue to vindicate their own health-related interests when the litigation involves the dissemination of information. If anything, we find the contrary to be true. People who join organizations such as these do so in order to promote health—that of the public, to be sure, but their own and their families' as well. They presumably seek to do so by collectively enlisting the assistance of their organizations—to educate members, to seek healthier environments, to work for legislation that will promote health, and to protect their interests through litigation. We find it particularly inappropriate to suggest that having affirmatively manifested an interest in their health and the health of others, these members have somehow hampered their own ability to vindicate this interest.

those who have suffered the requisite injury—are not themselves responsible for *activating* that standing by going into court. Thus, just as a child need not be aware of her injury (so long as it can be shown to exist) for her parent to have the requisite standing to bring suit as her representative, so too may the organizations in this action bring suit as representatives of their injured members, *so long as we are persuaded that members will in fact suffer the injuries.*

■ In contrast to some of our recent excursions into standing law, we do not find it necessary in this case to remand the record to the district court for further findings regarding these organizations' standing. *See* Amicus Br. at 33. *Compare National Wildlife Federation v. Hodel*, 839 F.2d at 703 (in which this court described how it had earlier remanded the record to the district court to "receive affidavits 'demonstrating specific injury' to members of the plaintiff environmental organizations"). Though we have considered such a course, we are unable to see how it would shed light on the critical issues before us. The organizations' allegation of standing, while broad,[25] properly outlines the injuries that endow them with the authority to bring this suit. As we have discussed, the nature of the members' injuries, while entirely foreseeable, render them incapable of particularization by individual affidavits. No persuasive argument is raised to undermine our acceptance of the factual elements of the allegation, which we find self-evidently plausible.

We therefore conclude that the organizations have standing to maintain this action, and we proceed to the merits.

### III. MERITS

#### A. *Standard of Review*

In reviewing an agency's interpretation of a statute, this court looks first to

"whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If a statute is ambiguous, or if it is silent on a particular issue, a court may assume that Congress implicitly delegated the interpretive function to the agency, but no such delegation may be found where Congress' intent is clear. *Id.* at 842–44, 104 S.Ct. at 2781–83. "The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986).

The Supreme Court has also recently instructed us that our inquiry into congressional intent must encompass both the particular language as well as the broader design of the statute. *K Mart Corp. v. Cartier, Inc.*, — U.S. —, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). Moreover, to the extent legislative history sheds light on Congress' intentions, we are not required to accord the agency's interpretations of that history any particular deference. *Washington Hospital Center v. Bowen*, 795 F.2d 139, 143 (D.C.Cir.1986). With these principles in mind, we address the provision of the Act at issue here.

#### B. *The Scope of the Act's Warning Requirement*

On its face, the Smokeless Tobacco Act imposes a blanket requirement, subject only to one narrow and specifically mentioned exception for billboard advertising, that producers and distributors of smokeless tobacco products must include a warning label whenever they "advertise ... any smokeless tobacco product." 15 U.S.C. § 4402(a)(2). In introducing the bill on the

---

**25.** It is wise to remember the Supreme Court's admonition that "[t]o deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *SCRAP*, 412 U.S. at 688, 93 S.Ct. at 2416; *see also Sierra Club v. Morton*, 405 U.S. at 734, 92 S.Ct. at 1366, ("[T]he fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.").

House floor, Representative Waxman declared that "[w]ith one exception, *all* advertising of smokeless tobacco is required to display one of the three health warnings." 132 Cong.Rec. 1329 (1986) (emphasis added).[26] Our understanding of the common meaning of the term "advertising," consistent with that contained in Webster's Third New Int'l Dictionary (1976), is that it involves any action to "call public attention to [a product] ... [,] so as to arouse a desire to buy." At the most basic level, this is surely what smokeless tobacco companies are doing when they splash their brand logos and selling messages across T-shirts and other promotional items. In a most straightforward manner, therefore, the Act appears plainly to require that utilitarian items used for promotional purposes contain warning labels.

Despite some initial wavering, the FTC appears to concede that utilitarian items are fully comprehended by the term "advertise" as it is used in the Act. The Commission does note early in its brief that where congressional intent is unclear, "the court need only determine that the agency's interpretation is a reasonable one," Br. of Appellant at 10, and then proceeds to argue that § 4402(a)(2) of the Act "is far more equivocal than the [district] court indicate[d]" when it found Congress' intent clear. *Id.* at 11. Pointing to language in the Act which, as quoted by the Commission, states that advertising must bear warnings *"in accordance with the requirements of this Act,"* § 4404(a)(2) (emphasis added) (as codified, the law refers to "the requirements of this chapter"), and noting that its own regulations will become part of the "requirements of the Act," the FTC apparently urges that Congress merely intended to require warnings when the FTC happened to agree that it would be prudent. However, this reading of the statute is tortured and implausible, and we decline to follow it. In effect, the Commission's spin on this language would leave the entire statutory scheme at the FTC's mercy: *any* exceptions granted by the FTC would be self-authorizing, because they would (under the FTC's reading) become a "requirement of the Act." This result flows inevitably from the circular reasoning employed in the FTC's interpretation. A more natural reading of the passage suggests that the warnings are required on all advertisements, and the particular requirements for size, placement, etc., of these warnings must be in accordance with provisions that are contained in other sections of the Act but not specifically delineated in this subsection.

Moreover, the FTC subsequently concedes, at least for purposes of this litigation, that utilitarian items *are* comprehended by the terms of the statute. In its reply brief, the Commission acknowledges that the Smokeless Tobacco Council's *amicus* brief suggests that this case could be disposed of by a simple finding that utilitarian items distributed for promotional purposes are not "advertising" within the meaning of the Act.[27] The FTC now candidly concedes, however, that this "argument was not raised before the district court and is not properly raised here." Reply Br. at 4 n. 2. We are thus left no choice but to assume for purposes of this litigation that utilitarian items distributed for promotional purposes are "advertising" as that term is used in the Smokeless Tobacco Act.[28] Without more, this would be enough to end the case.

---

**26.** Senator Hatch had earlier declared on the Senate floor that a prior version of the Act would "require[ ] a warning to be printed on *all other advertisements."* 131 Cong.Rec. 36499 (1985) (emphasis added).

**27.** This position is similar to the one advanced by the FTC itself when it announced its final regulations, where its first explanation for its decision to exempt utilitarian items from the warning requirements was that "advertising and other promotional expenditures are commonly distinguished." 51 Fed.Reg. at 40,007.

**28.** The unambiguous way in which the requirement that all advertising bear warning labels is stated in § 4402(a)(2) distinguishes this case from *Young v. Community Nutrition Institute,* 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986), in which the Supreme Court gave deference to an agency's interpretation of a statutory provision couched in truly ambiguous, as opposed to merely capacious, language.

Despite the apparently direct statutory mandate, however, the attorney for *amicus* Smokeless Tobacco Council spent all of his allotted time arguing that similarities between the warning requirement for cigarette advertising and the warning requirement at issue in this case compel the conclusion that Congress must have intended to exempt utilitarian items from the broad warning requirements otherwise imposed by the Smokeless Tobacco Act. We disagree. It is true that a striking parallel exists between the two provisions. The Cigarette Labeling and Advertising Act ("Cigarette Act") provides that

> [i]t shall be unlawful for any manufacturer or importer of cigarettes to advertise or cause to be advertised (other than through the use of outdoor billboards) within the United States any cigarette unless the advertising bears, in accordance with the requirements of this section, one of the [warning] labels.

15 U.S.C. § 1333(a)(2). This language surely has a familiar ring. The Smokeless Tobacco Council argues that Congress transported this language from the Cigarette Act to the Smokeless Tobacco Act, and in so doing, the Council maintains, Congress affirmatively intended to carry over the exception for utilitarian items that is recognized under the earlier act.

Even assuming *arguendo* that the Council has correctly identified the source of the Smokeless Tobacco Act's language, we see important factors suggesting that the Council's ultimate assertion is not correct. The plain language of both provisions appears, without reference to any other materials, to cover *all* forms of advertising, including utilitarian items used for pro-

motional purposes. The only reason that the Cigarette Act, which was passed in 1984, is understood, contrary to its terms, to exempt utilitarian items from the law's broad provisions is because its legislative history expressly states that it was Congress' intent to preserve the arrangements made under consent agreements entered into by the FTC and the Tobacco industry in 1972 and 1981. *See* H.R.Rep. No. 805, 98th Cong., 2d Sess. 17 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3718, 3730. The Smokeless Tobacco Council would implicitly have us import this legislative history into the comparative void that preceded the enactment of the Smokeless Tobacco Act.[29]

But if one thing is clear in the otherwise sparse legislative history of the Smokeless Tobacco Act, it is that the Cigarette Act's legislative history was *not* meant to be incorporated. Indeed, Senator Hatch, chairman of the committee that reported out the original bill, made the committee's view clear on the Senate floor by stating that the legislation was *"not* intended as an amendment to [the Cigarette Act] or to adopt its legislative history." 131 Cong. Rec. 36,499 (1985) (emphasis added). The FTC announced its own conclusion that "the legislative history of the Smokeless Tobacco Act supports the position that Congress intended to treat smokeless tobacco products differently than cigarettes." 51 Fed.Reg. at 40,007.[30] We therefore conclude that the legislative history of the Cigarette Act provides no reason to construe the terms of the Smokeless Tobacco Act contrary to the straightforward meaning they convey on their face.[31]

---

**29.** Because of the peculiar procedural route the Act travelled to enactment, we have no House Report, no Conference Report, and a Senate Report which does not speak to the particular provisions that are contested in this action. We are thus left with the general background provided by the Senate Report, along with the brief floor statements made by the bill's sponsors prior to final enactment.

**30.** The FTC went on to acknowledge that it "[did] not believe that the existence of an exemption for cigarettes in and of itself offers a legal basis for exempting classes of materials from the Smokeless Tobacco Act," although the

Commission did look to the cigarette exemptions for "practical guidance as to what types of materials should be covered." 51 Fed.Reg. at 40,007.

**31.** This conclusion is further supported by focusing on one particular component of both the cigarette and the smokeless tobacco provisions. Both sections specifically exclude advertising "through the use of outdoor billboard advertising" from their coverage. Indeed, the inclusion of this clause in both sections is among the most persuasive superficial evidence that the two sections should be read to require the same things. However, further analysis of each section dem-

For these reasons, we conclude that the Smokeless Tobacco Act plainly covers utilitarian items that are distributed for promotional purposes. The only issue that remains to be discussed is whether there exists some reason to conclude that the Commission nevertheless had the authority to grant an exception to the statute.

## C. *The Agency's Residual Authority to Create Exceptions*

The crux of the FTC's argument in this litigation is that *despite* the Act's coverage of utilitarian items, a residual authority inheres in an agency that is charged with implementing a statute to create certain narrow exceptions to the statute.[32] Relying primarily on *Alabama Power Co. v. Costle*, 636 F.2d 323, 357–60 (D.C.Cir.1979), the Commission advances two major arguments, which we deal with and reject in turn.

First, the Commission argues that the exemption for utilitarian items is "administratively necessary." In *Alabama Power*, this court noted that there exists a narrow range of inherent discretion in an agency to create case-by-case exceptions in order to come within the practical limits of *feasibility* in administering a statute. *See* 636 F.2d at 357. Relying on this doctrine, the Commission points to the "practical problems" that would be encountered in requiring health warnings on items "such as golf balls and cuspidors," 51 Fed.Reg. 40,007. Whatever merit this observation has in the abstract, we do not see what earthly connection it has to the broad exception that the Commission has hacked out of the Act:

while acknowledging that some items might be so small as to render it practically impossible to fit a warning on them, we do not see how that justifies exempting T-shirts, beach blankets, and other items from the requirements of the Act. This court in *Alabama Power* expressly noted that "there exists no general administrative power to create exemptions to statutory requirements based upon the agency's perceptions of costs and benefits." 636 F.2d at 357. Yet the Commission proposes, in the name of *Alabama Power*, to create just such an expansive power in this area.

Second, the Commission argues that it has *"de minimis* authority" to create this exception. In *Alabama Power*, this court recognized that "the law does not concern itself with trifling matters." 636 F.2d at 360. The court therefore explained that an administrative agency has an implied *de minimis* authority to create even certain categorical exceptions to a statute "when the burdens of regulation yield a gain of trivial or no value." *Id.* at 360–61. Here, the FTC argues that the particular wording of the required warnings—*e.g.*, "This product may cause mouth cancer"—leaves the antecedent ambiguous, and when affixed to utilitarian items it will convey a double meaning that will subject the intended message to counter-productive derision:

> In any print advertisement, regardless of whether it contains a picture, the antecedent to "this product" is unambiguous —the product advertised. When a personal utilitarian item, such as a pencil or cap or T-shirt or golf ball, is used to promote a smokeless tobacco product,

---

onstrates that the billboard exception was adopted for *entirely different reasons in the two* Acts. The House sponsor of the Smokeless Tobacco Act stated that billboards were excluded from his legislation because "at the present time, there is very little, if any, advertising of these products" on billboards. 132 Cong.Rec. 1329 (statement of Rep. Waxman). By contrast, billboards were excluded from § 2 of the Cigarette Act, which required long-form warnings on most other advertisements, so that this unique form of outdoor advertising could be addressed in § 3 of the Cigarette Act, which requires shorter warnings (that are presumably safer to read from a moving car) to appear on billboards. *See* 15 U.S.C. § 1333(a)(3).

**32.** The FTC also argues that Congress' express grant of authority to develop requirements as to the size, color, and typeface of the warning, as well as responsibility for determining the best placement of the warning on packages, gave it the authority to create other broader exceptions from the Act. It is not necessary to agree with the district court's conclusion that the Commission's authority under the Act was largely "ministerial," 688 F.Supp. at 669, for us to conclude that the narrow grant of discretion should not be read to create other "implied" powers to make exemptions from the Act. This reading would go far beyond what the terms of the express delegation of authority will bear.

however, the utilitarian item itself becomes another potential antecedent to "this product." Thus, the warning is highly susceptible to ridicule or trivialization when placed on a separate functional item, but not otherwise.

Reply Br. at 12. Indeed, in a burst of zealous advocacy, the Commission even predicts the day when these utilitarian items will become "cult objects sought after to demonstrate the silliness of well-intended regulation carried to excess." Br. for Appellant at 17–18. The Commission concludes that these risks of ridicule might outweigh the benefits of including the warnings on utilitarian items.

The Commission's reasoning reflects a misunderstanding of the *de minimis* exception doctrine. The authority to create these exceptions does *not* extend to "a situation where the regulatory function does provide benefits, in the sense of furthering the regulatory objectives, *but the agency concludes that the acknowledged benefits are exceeded by the costs.*" *Alabama Power*, 636 F.2d at 360–61 (emphasis added). The reason for this limitation should be clear. While agencies may safely be assumed to have discretion to create exceptions at the margins of a regulatory field, they are not thereby empowered to weigh the costs and benefits of regulation at every turn; agencies surely do not have inherent authority to second-guess Congress' calculations. The FTC's exception for utilitarian items does not meet the *Alabama Power* standard: warnings on these items would have conceded benefits; the FTC's position is that the perceived negative effects (derision, etc.) would either outweigh those benefits or render them minimal.[33] This balancing requires a more explicit congressional grant of authority than is present here.[34]

## IV. CONCLUSION

■ The FTC's basic argument is that Congress overreached and was excessively rigid in passing the Comprehensive Smokeless Tobacco Act, and the FTC urges this court to ratify the agency's efforts to bring the requirements back into line. In cases where congressional rigidity leads to patently absurd results that will undermine Congress' broader purposes, an agency will be on firmer ground in taking minor interpretive liberties. But in this case, Congress' rigidity is not a sign of its folly, but rather signals its intent to act swiftly and decisively to stem the dangerous growth of smokeless tobacco consumption. Whatever else may be said, Congress has the general authority to take such rigid measures. And absent an express grant of authority to change the terms of the statute, we will not imply agency authority to alter the statutory mandate.

For the foregoing reasons, we conclude that the FTC's decision to exempt utilitarian items bearing promotional logos and messages from the warning requirements of the Smokeless Tobacco Act was not in accordance with the law. *See* 5 U.S.C. § 706. The judgment of the district court is therefore

*Affirmed.*

---

**33.** The FTC appears to concede that the public will understand what the warning on utilitarian items is *intended* to refer to. *See* Br. for Appellant at 18. Its only argument is that the conveyance of this message will *also* give rise to ridicule. Thus, we do not confront circumstances where rigid application of a statutory mandate would lead to patently absurd results. Rather, the Commission here argues that it has determined, after conducting its own balancing of various factors, that the net benefit of warnings in this context would be minimal.

**34.** Because we conclude that the Commission was wholly without authority to create the exemption for utilitarian items, we need not address the district court's separate ground, advanced on appeal by appellees, that the agency's exercise of discretion was arbitrary and capricious.