82 F.3d 451
 42 ERC 1577, 317 U.S.App.D.C. 207, 26
Envtl. L. Rep. 20,968
 ENVIRONMENTAL DEFENSE FUND, INC., Sierra Club, Natural
Resources Defense Council, Inc., Conservation Law
Foundation, Oregon Environmental Council, Delaware Valley
Citizens Council for Clean Air, Petitioners
v.
ENVIRONMENTAL PROTECTION AGENCY, et al., Respondents,
American Trucking Associations, Inc. and American Road and
Transportation Builders Association, Intervenors.
 Nos. 94-1044 and 94-1062.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 13, 1995.
Decided April 19, 1996.
 
 Howard I. Fox, Washington, DC, for Sierra Club Legal Defense Fund, et al., and Robert E. Yuhnke, Chicago, IL, for Environmental Defense Fund, Inc., argued the cause for the petitioners. On brief were William S. Curtiss, San Francisco, CA, and James T. Tripp, New York City.
 Eileen T. McDonough, Washington, DC, and Alan J. Birnbaum, New York City, Attorneys, Department of Justice, argued the cause for the respondents. On brief were Lois J. Schiffer, Assistant Attorney General, Department of Justice, Sara Schneeberg, Attorney, Environmental Protection Agency, and Peter J. Plocki, Attorney, Department of Transportation, Washington, DC, Mary E. Ward, Attorney, Winston-Salem, NC, Department of Justice, entered an appearance.
 F. William Brownell and Lee A. Casey, Washington, DC, for American Road and Transportation Builders Association, and Linda S. Mounts, Alexandria, VA, for American Trucking Associations, Inc., were on the joint brief for the intervenors. Mark G. Weisshaar, Washington, DC, entered an appearance for American Road and Transportation Builders Association.
 Before: SILBERMAN, GINSBURG and HENDERSON, Circuit Judges.
 Opinion for the Court filed Per Curiam.
 
 PER CURIAM:
 
 1
 The petitioners, six environmentalist associations,[1] (collectively cited as EDF) seek review of regulations promulgated by the Environmental Protection Agency (Agency or EPA) pursuant to section 176 of the Clean Air Act, 42 U.S.C. § 7506. For the reasons set forth below, we deny the petitions for review.
 
 I. STATUTORY BACKGROUND
 
 2
 Since 1970 the Clean Air Act has required states to adopt, after reasonable notice and public hearings and approval by the Agency, State Implementation Plans (SIPs) that "provide[ ] for implementation, maintenance, and enforcement" of "national ambient air quality standards." 42 U.S.C. § 7410(a)(2)(A). In 1977 Congress amended the Act by adding section 176, 42 U.S.C. § 7506. That section, as amended, requires each federal agency to determine that a proposed activity in a "nonattainment" or "maintenance" area[2] conforms to an applicable SIP before the agency can "engage in, support in any way or provide financial assistance for, license or permit, or approve" the activity and prohibits a "metropolitan planning organization"[3] from approving "any project, program, or plan which does not conform to [an applicable SIP]." 42 U.S.C. § 7506(c)(1).[4] Subsection (c)(2) of section 176 specifically addresses conformity of transportation programs and plans "developed pursuant to Title 23 or the Urban Mass Transportation Act." Each of the cited laws requires that a metropolitan planning organization establish for its area both a "long range" transportation plan and a "transportation improvement program" (TIP). 23 U.S.C. § 134(g), (h); 49 U.S.C. §§ 5303(f), 5304(a).[5] Subsection (c)(2) requires that the transportation plans and TIPs "implement the transportation provisions of any applicable [SIP] applicable to all or part of the area covered by such transportation plan or program" and prohibits federal approval, acceptance or funding of any transportation plan unless it is first found to conform to the SIP.[6] 42 U.S.C. § 7506(c)(2). In addition, subsection (c)(4) further directs the Agency to "promulgate criteria and procedures for determining conformity" under the statute. Accordingly, the Agency published its final "Transportation Conformity Rule" on November 24, 1993, see 58 Fed.Reg. 62,188, and its final "General Conformity Rule" on November 30, 1993, see 58 Fed.Reg. 63,214. It is to portions of these rules that the petitioners mount their challenge. We address each challenged regulation separately.
 
 II. GRANDFATHER PROVISION
 
 3
 First, the petitioners challenge "grandfather" provisions that temporarily exempt certain projects from the section 176 conformity determination requirements. Both final rules require generally that conformity determinations for covered projects be made before any federal action is taken on them. See 40 C.F.R. §§ 51.850(a)-(b), 51.394(a).[7] Each rule exempts from the conformity determination requirement, however, projects that have undergone recent National Environmental Policy Act (NEPA) analyses--for non-transportation projects within the preceding five years and for transportation projects within the preceding three years. See 40 C.F.R. §§ 51.850(c)(1), 51.394(c)(1).[8] The petitioners contend the rules' "grandfather" provisions conflict with the clear conformity mandate of section 176(c)(1) and (c)(2). We disagree.
 
 
 4
 While the statute requires that a conformity determination be made before any federal action is taken, it also vests the Agency with discretion to set "the appropriate frequency for making conformity determinations" so long as "such determinations for transportation plans and programs [not] be less frequent than every three years." 42 U.S.C. § 7506(c)(4)(B)(ii). Exercising its discretion, the Agency set a conformity determination deadline of five years after a NEPA analysis for non-transportation projects and three years after a NEPA analysis for transportation projects. See 40 C.F.R. § 51.857(a) ("The conformity status of a Federal action automatically lapses 5 years from the date a final conformity determination is reported under § 51.855, unless the Federal action has been completed or a continuous program has been commenced to implement that Federal action within a reasonable time."); 40 C.F.R. § 51.394(c)(1) (exempting conformity determinations for transportation projects if there has been a "NEPA process completion" "within the past three years"). As the Agency explained, the accommodation was necessary to avoid immediate "retroactive" implementation of the new conformity requirement which would impose a substantial and unforeseen burden on federal projects that had already satisfied existing federal requirements. 58 Fed.Reg. at 63,216; see also 58 Fed.Reg. at 62,200 ("By proposing to allow projects which have final approval to proceed, and by proposing to require only one project-level conformity determination, EPA intended to avoid disrupting the implementation process for projects which are underway."). The resulting scheme permits projects in compliance with former statutory requirements, as demonstrated by the NEPA review, to proceed as planned so long as the newly required compliance determination is made according to the Agency's regulatory schedule. Because its schedule is consistent with the statutory language (preserving the one statutorily fixed three-year deadline for transportation project compliance determinations), we conclude it must be upheld as a reasonable exercise of the Agency's express statutory discretion to set conformity determination deadlines. See Woolen Mill Assocs. v. FERC, 917 F.2d 589, 593 (D.C.Cir.1990).
 
 III. IMPLEMENTATION
 
 5
 Next, the petitioners challenge two additional regulations on the ground that they permit untimely implementation of "transportation control measures" (TCMs)[9] in violation of the express requirements of section 176. We conclude both regulations reflect reasonable interpretations of the statutory language.
 
 
 6
 The petitioners first contend that 40 C.F.R. § 51.418(c)(1) allows approval of a TIP when the TIP's TCMs "are behind the schedule established in the applicable implementation plan" and therefore violates the statutory requirement that "no metropolitan planning organization or other recipient of funds under Title 23 or the Urban Mass Transportation Act shall adopt or approve a transportation improvement program of projects until it determines that such program provides for timely implementation of transportation control measures consistent with schedules included in the applicable implementation plan." 42 U.S.C. § 7506(c)(2)(B). According to the petitioners, the challenged regulation conflicts with the statute's clear mandate that no transportation project be approved unless it requires implementation of TCMs in strict compliance with the SIP schedules. We believe the petitioners construe the phrase "consistent with" too narrowly. Preceding the preposition "with," "consistent" means "agreeing or according in substance or form," that is "congruous" or "compatible." 3 Oxford English Dictionary 773 (2d ed. 1989). Thus, the statutory language does not require exact correspondence between the SIP TCM schedule and the TIP's implementation schedule but only congruity or compatibility between them. Cf. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898-99 (9th Cir.1986) (statutory phrase "consistent with the national contingency plan" in 42 U.S.C. § 9607(a)(2)(B) "does not necessitate strict compliance with [national contingency plan's] provisions") (citing Wickland Oil Terminals v. Asarco, Inc., 792 F.2d 887, 891-92 (9th Cir.1986)). Such congruity is attained under the promulgated regulation which permits deviation from a SIP schedule only when "the [metropolitan planning organization] and [the Department of Transportation] have determined that past obstacles to implementation of the TCMs have been identified and have been or are being overcome, and that all State and local agencies with influence over approvals or funding for TCMs are giving maximum priority to approval or funding of TCMs over other projects within their control." 40 C.F.R. § 51.418(c)(1). The Agency determined that "this approach is a practical necessity to accommodate uncontrollable delays." 58 Fed.Reg. at 62,197. Given the flexible statutory language we must defer to the agency's determination.
 
 
 7
 Second, the petitioners challenge 40 C.F.R. § 51.418(b)(1) and (c)(1) insofar as those subsections require that transportation plans and TIPs provide for timely implementation of only those TCMs "which are eligible for funding under title 23 U.S.C. or the Federal Transit Act." The Agency explained the reason for limiting the regulation to projects eligible for federal funding in the preamble to the final transportation conformity rule:
 
 
 8
 Clean Air Act section 176(c)(2)(B) requires TIPs to provide for timely implementation of TCMs, but does not define TCMs. The statute is therefore ambiguous with respect to which TCMs must be implemented, and EPA may take any reasonable interpretation of the definition of TCMs. Chevron v. NRDC, 467 U.S. 837 [104 S.Ct. 2778, 81 L.Ed.2d 694] (1984). Since plans and TIPs can at the most "provide for" only those projects which are eligible for Federal funding, it is reasonable to define those TCMs required to be implemented by Clean Air Act section 176(c)(2)(B) to be only those SIP TCMs that are eligible for Federal funding.
 
 
 9
 58 Fed.Reg. at 62,211. We find the Agency's rationale persuasive and the challenged limitation consistent with the statutory language. The petitioners argue that under the statute transportation plans and TIPs must "provide for" timely implementation of non-federally fundable TCMs by allocating federal funding of eligible projects in such a way that state funds are freed for funding of ineligible projects. Like the Agency we doubt that Congress intended so strained a reading of its federal funding legislation. Nevertheless, assuming that the petitioners' position is reasonable, we must still defer to the Agency's view which is at least equally compatible with the statutory language. See Natural Resources Defense Council, Inc. v. Thomas, 805 F.2d 410, 439 (D.C.Cir.1986) (in spite of petitioners' "often plausible" interpretations, where "the EPA was able to adduce an equally reasonable interpretation of the law it was assigned to execute, we must defer to the agency").
 
 IV. "CONTRIBUTE TO" IN THE INTERIM PERIOD
 
 10
 Section 176(c) provides for conformity determinations to be made for transportation plans, programs, and projects before revised SIPs are approved by the Agency. During this so-called "interim period," transportation plans and improvement programs may be found to conform if inter alia they, "with respect to ozone and carbon monoxide nonattainment areas, contribute to annual emissions reductions consistent with [42 U.S.C. §§ 7511a(b)(1) and 7512a(a)(7) ]." 42 U.S.C. § 7506(c)(3)(A) (emphasis added). Section 7511a(b)(1) requires that SIPs provide for "Moderate Area" emissions reductions of volatile organic compounds in an amount "of at least 15 percent from [1990] emissions" by 1996, and for "such specific annual reductions in emissions of volatile organic compounds and oxides of nitrogen as necessary to attain the national primary ambient air quality standard for ozone" by the applicable date. 42 U.S.C. § 7511a(b)(1)(A)(i). Section 7511a(b)(1) further provides that certain emissions reductions--increasingly demanding tailpipe exhaust standards, for example--will not be creditable toward the required 15% reduction. Section 7512a(a)(7) states that, within "Moderate Areas," SIPs must provide for attainment of the carbon monoxide national ambient air quality standard and for "such specific annual emission reductions as are necessary to attain the standard" by the applicable date.
 
 
 11
 The Agency's rules for determining whether a transportation plan (40 C.F.R. § 51.436) or program (40 C.F.R. § 51.438) "contributes to annual emissions reductions" during the interim period require two comparisons. The metropolitan planning organization (or other recipient of federal highway funds) determines what the transportation emissions levels for volatile organic compounds, oxides of nitrogen, and carbon monoxide were for 1990. The metropolitan planning organization must also predict the emissions from its transportation system if the projects existing or very near completion today were to continue to exist at specified points in the future but without the plan or program. This level of emissions is called the "Baseline" or "no build" scenario. And, the future emissions if the given transportation plan or improvement program were to be implemented and if other regionally significant projects were to be undertaken--the "Action" or "build" scenario--must be determined. Once these three emissions levels are calculated, the metropolitan planning organization compares the Action scenario emissions with the emissions under the Baseline scenario and with the emissions level as of 1990. If the Action scenario emissions are lower than both the Baseline and 1990 emissions, then the transportation plan or improvement program has met the "contribute to" requirement.
 
 
 12
 Petitioners challenge the "contribute to" rules, which allegedly fail to require that the transportation plan or improvement program reduce emissions at all, much less at the amount that the statute is said to command. Petitioners complain that non-plan and non-improvement program technologies and measures that reduce emissions after 1990 may render the Action scenario emissions lower than 1990 levels even though the plan or improvement program fails to produce any emissions reduction.[10] Further, petitioners contend that the rule improperly allows the Action scenario to account for projects and traffic reduction measures not included in the plan or improvement program. If non-plan, non-improvement program projects reduce Action scenario emissions enough, the plan and improvement program need not reduce emissions at all and may in fact increase emissions. It is also argued that the Action scenario allows credit to be taken for emissions reductions that are expressly noncreditable under section 7511a(b)(1)(D). Permitting plans and programs to be found to conform despite their contributing no emissions reductions is particularly egregious, petitioners suggest, since the plan or improvement program must reduce emissions at a level sufficient to meet the 15% requirement set forth in section 7511a(b)(1).
 
 
 13
 The Agency does not disagree with petitioners' assessment of the possible consequences of its "contribute to" regime. Rather, it takes issue with the premise of petitioners' criticisms: that the plan or improvement program must itself produce an absolute reduction in the given emissions. According to the Agency, section 176(c)(3)(a)(iii) may be interpreted such that a plan or improvement program need not itself produce demonstrable emissions reductions so long as the projected emissions of a region with the plan or improvement program are lower than those for the region without the plan or improvement program. The Agency asserts that plans and improvement programs may "contribute to" emissions reductions by "avoiding or reducing increases in emissions over the years." EPA Br. at 46. It is also argued that the contribution to the emissions reductions need only be "consistent with" the provisions of sections 7511a and 7512a--a requirement that is met so long as the contribution is "congruous" or "compatible" with the reductions required by those sections even though the contribution may not comport with every jot and tittle of those sections. Along these lines, the Agency further contends that the determination of whether a plan or improvement program contributes to annual emissions reductions need not be performed according to the standards of section 7511a(b)(1)(D)--which provides that certain kinds of emissions reductions are not creditable. Those crediting restrictions are said to apply only to SIP revisions, not to plans and programs adopted in the interim. And, those provisions apply to computing the ultimate 15% reduction in emissions, not to the annual emissions reductions required by section 7511a(b)(1) to which section 176(c)(3)(a)(iii) specifically refers.
 
 
 14
 Petitioners contend that the "contribute to" rules run afoul of the plain language of the statute by failing to require that any given plan or program produce emissions reductions by itself. The Agency has demonstrated, however, that the "contribute to" language of the statute--particularly in combination with the "consistent with" language--is ambiguous. In the first place, the language leaves wide open the question of how large a reduction in emissions must be to constitute a contribution. As the Agency discussed in its notice of proposed rulemaking, the language could be read to require that the plan or program produce "any nonzero reduction" or it could be read to require that the plan or program provide for the entire 15% reduction in volatile organic compounds required under section 7511a(b)(1). Nor does the language clearly set forth whether emissions reductions that can be counted as contributing to annual emissions are those directly attributable to the implementation of the plan or program, or those that follow indirectly. In the face of this ambiguity, and given the statute's express directive to the Agency to "promulgate criteria and procedures for demonstrating and assuring conformity in the case of transportation plans, programs, and projects," § 176(c)(4)(A), we will uphold the Agency's rules if they are reasonable.[11]
 
 
 15
 We think that it was reasonable for the Agency to construe the "contribute to ... consistent with" requirement as not necessarily requiring the reduction of emissions attributable to the plan or program standing alone. Sections 7511a(b)(1) and 7512a(a)(7) require reductions in volatile organic compounds, nitrogen oxide, and carbon monoxide, but do not require that the emissions come entirely from mobile sources.[12] A requirement that the transportation plan or program provide all the statutorily required reductions would seem to impinge on the prerogative of states to determine how and where to comply with the Act's emissions reductions requirements. A plan or program that does not reduce emissions, but that facilitates the reduction of emissions by other projects could still "contribute to annual emissions reductions consistent with sections 7511a(b)(1) and 7512a(a)(7)." And, as we have noted with respect to the requirement of timely implementation of transportation control measures, the requirement that the contributions be "consistent with" sections 7511a(b)(1) and 7512a(a)(7) calls for congruence or compatibility with those sections, not lock-step correspondence. The Agency's test for interim-period conformity may not be perfect--it seems to us that the test could also result in the converse of the problem petitioners identify: emissions reductions directly attributable to a plan or program could be erased by increased emissions from non-plan, non-program projects included in the Action scenario--but we cannot say that it is unreasonable. The Agency acted well within its delegated discretion in construing the "contribute to" language for interim-period transportation plans and improvement programs as it has.
 
 V. STATE TRANSPORTATION PLANS AND PROGRAMS
 
 16
 Under 23 U.S.C. § 135 (1994), states must prepare statewide transportation plans and improvement programs similar to those required of metropolitan planning organizations. The Agency's transportation regulations require that metropolitan planning organization's transportation plans and programs conform to the relevant SIP, but do not require conformity determinations for state transportation plans or programs. See 40 C.F.R. § 51.392 (definition of "transportation improvement program" and "transportation plan"). Petitioners challenge the exclusion of state transportation planning from the Clean Air Act's conformity requirements, arguing that the Agency has improperly circumscribed a broad statutory provision. Section 176(c)(2), after all, requires conformity determinations to be made for "[a]ny transportation plan or program."
 
 
 17
 We agree with the Agency that it reasonably defined "transportation plan or program" to be only those plans or programs adopted by metropolitan planning organizations and that not requiring state plans or programs to conform in no way works to reduce the protections afforded air quality under the statute. A state transportation plan or program must include the plans or improvement programs adopted by metropolitan planning organizations within that state. Before any plan or improvement program can be included in the state's plan or program, it must be found by the relevant metropolitan planning organization to conform to the SIP. See 23 C.F.R. § 450.312(d). A state may well include both areas that have and areas that have not attained the national ambient air quality standards. The conformity requirements, however, apply only to nonattainment areas. The Agency concluded, therefore, that little was to be gained by requiring state plans and programs to conform. An area inside a state that was covered by the conformity rules--a nonattainment area--and contained a metropolitan planning organization would necessarily already have a conforming plan or improvement program. Under petitioners' reading of the statute, attainment areas within the state would be forced to undergo conformity determinations that Congress did not intend to require.[13] We further agree with the Agency that the information yielded by conformity determinations at the state level is of minimal additional value--we are told, and petitioners do not dispute, that analyses for purposes of determining conformity are performed by region, not by state. See 58 Fed.Reg. at 62,206.
 
 VI. TRANSPORTATION PROJECTS
 
 18
 As noted above, "transportation plans, programs, and projects" are subject to specific conformity requirements to which their non-transportation counterparts are not. The Agency's transportation conformity rules define "transportation project" to encompass only highway or transit projects. 40 C.F.R. § 51.392. Petitioners challenge this limited definition, arguing that the Agency has ignored Congress' intent to apply the conformity requirements specific to transportation to all manner of transportation. The effect of the Agency's definition is to leave air, water, and rail transportation projects and their emissions subject only to the general conformity requirements--if they are subject to any requirement at all: petitioners argue that because projects included in transportation plans or improvement programs are exempted from the general conformity rule, non-highway and non-transit transportation projects slip all statutory punches.
 
 
 19
 The Agency counters that it reasonably construed "transportation projects" to include only highway or transit modes. It argues that the statute, read as a whole, clearly contemplates conformity requirements only for plans encompassing transit or highway projects. The only statutory references in section 176(c)(2) are to statutes concerned with highway and transit projects: 23 U.S.C. and the Urban Mass Transit Act, 49 U.S.C. § 5301, et seq. Non-highway and non-transit transportation facilities, such as airports, ports, and interstate railroads, are covered by statutes not set forth in section 176(c). The Agency acknowledges that 23 U.S.C. § 134(a) identifies promotion of intermodal transportation as an important national goal. Toward that end, however, metropolitan planning organizations are given no authority over non-highway and non-transit modes of transportation. Given the metropolitan planning organization's inability to control the development of air, rail (other than transit rail), or water transportation, and Congress' manifest intent in section 176(c) to prescribe special conformity requirements for highway and transit forms of transportation, the Agency contends that it reasonably limited the definition of "transportation projects."
 
 
 20
 We have little difficulty upholding the Agency's definition of "transportation project." It is hardly insensible to conclude that the types of transportation that Congress wished to reach with the special transportation conformity rules were those modes over which the entities listed, metropolitan planning organizations and recipients of funds under Title 23 or UMTA, have authority. As the Agency notes, metropolitan planning organizations and recipients of highway and transit funds (at least in their capacity as recipients of highway funds[14]) have no authority with respect to airports, shipping, or non-transit rail transportation. Petitioners contend that metropolitan planning organizations' responsibility for intermodal planning ought to be sufficient to regard airports, ports, and interstate railroads as part of the metropolitan planning organization's bailiwick. In fact, however, both statutory sections imposing the "intermodal" planning requirement list air, water, and rail modes separately from "intermodal transportation facilities," suggesting that, e.g., an airport is not an intermodal transportation facility. See 23 U.S.C. § 134(f)(7) (metropolitan planning organizations must "consider" "[i]nternational border crossings and access to ports, airports, intermodal transportation facilities, major freight distribution routes, national parks, recreation areas, monuments and historic sites, and military installations.") (emphasis added); see also 49 U.S.C. § 5303(b)(7) (same). Congress has also stated that the "National Intermodal Transportation System" shall "provide improved access to ports and airports," 49 U.S.C. § 5501(b)(4), further suggesting that a requirement of intermodal planning does not give the metropolitan planning organization control over airports--it merely requires that access to airports be accounted for in intermodal planning.[15] Given Congress' clear focus in section 176(c)(2) on projects that are "adopted," "approved," or "accepted" by metropolitan planning organizations or highway fund recipients, we think that the Agency properly limited the reach of Congress' transportation rules to projects over which these entities have authority.
 
 
 21
 Nor are we persuaded by petitioners' contention that air, water, and rail modes of transportation will fall into a regulatory nether region if they are not subject to the transportation rules. The regulation to which petitioners point as providing the supposed loophole, 40 C.F.R. § 51.858(a)(5)(ii), permits activities "specifically included" by a metropolitan planning organization in a conforming plan or improvement program to proceed without a further conformity determination. We doubt that the Agency could argue that the projects over which a metropolitan planning organization has no authority--a lack of authority on which it relied in not requiring transportation conformity determinations for these projects in the first place--could nonetheless be "specifically" included in a metropolitan planning organization's transportation plan or program.[16]
 
 VII. INDIRECT EMISSIONS
 
 22
 In performing a conformity determination, a federal agency is to consider the emissions that will result from its action both directly and indirectly. 40 C.F.R. § 51.858(a); 58 Fed.Reg. 63,218/2. The EPA has defined direct emissions as "those emissions of a criteria pollutant or its precursors that are caused or initiated by the Federal action and occur at the same time and place as the action." 40 C.F.R. § 51.852. Indirect emissions, on the other hand, are those that:
 
 
 23
 (1) Are caused by the Federal action, but may occur later in time and/or may be farther removed in distance from the action itself but are still reasonably foreseeable; and
 
 
 24
 (2) The Federal agency can practicably control and will maintain control over due to a continuing program responsibility of the Federal agency.
 
 
 25
 Id.
 
 
 26
 EDF objects to the second clause of this latter definition on the ground that it creates an exemption for emissions that are the reasonably foreseeable result of federal action but that are not within the agency's "continuing program responsibility." This exemption, EDF contends, is inconsistent with the Congress's broad command that "[n]o department, agency, or instrumentality of the Federal Government shall engage in ... [or] support in any way" an activity that does not conform to the applicable state implementation plan, 42 U.S.C. § 7506(c)(1), and with the statutory definition of "conformity" set out in 42 U.S.C. § 7506(c)(1):
 
 
 27
 Conformity to an implementation plan means--
 
 
 28
 (A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and
 
 
 29
 (B) that such activities will not--
 
 
 30
 (i) cause or contribute to any new violation of any standard ...;
 
 
 31
 (ii) increase the frequency or severity of any existing violation of any standard ...; or
 
 
 32
 (iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.
 
 
 33
 EDF argues that the "support in any way" and "cause or contribute" wording evinces an intent by the Congress to require each federal agency to take into account all reasonably foreseeable emissions, regardless of whether they are within the agency's continuing control. Under this reading, for example, before the Army Corps of Engineers could grant a permit for dredge-and-fill activities as part of a new private shopping center development, the Army Corps would have to examine all reasonably foreseeable emissions--including not only the emissions produced by the equipment involved in the dredge-and-fill operation but also those resulting from the construction and continuing operation of the shopping center.
 
 
 34
 The question before us, then, is whether the statute requires consideration of the emissions that the EPA exempted--that is, emissions that are the reasonably foreseeable result of the federal action, but that are separated in time or place from the federal action itself and are not within the agency's control. In answering this question, we must first look to the statute itself to determine whether the Congress clearly expressed its intent. Because the legislative history of the statute provides little guidance on the general conformity rule, our inquiry begins and ends with the text of the statute.
 
 
 35
 Neither "support" nor "cause" are defined in the statute, nor does the statute address whether or to what extent the federal agency must consider emissions that are caused by the federal action only indirectly. Moreover, in enacting this statute the Congress expressly delegated to the EPA the responsibility for promulgating "criteria and procedures for determining conformity" under the general conformity rule. 42 U.S.C. § 7506(c)(4)(A). We must therefore defer to the EPA's interpretation of the relevant and undefined terms in the statute, as long as that interpretation is reasonable. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984).
 
 
 36
 In determining to what extent federal agencies must consider indirect emissions in their conformity analyses, the EPA properly focused upon the provision that forbids the federal government to "support in any way" an activity that does not conform to the applicable implementation plan. See 58 Fed.Reg. 63,220-22. That is the only proscription that could describe the relationship between a federal action and a subsequent activity that is outside the control or responsibility of the federal agency. (The prohibitions on a federal agency's engaging in, providing financial assistance for, licensing, permitting, or approving a nonconforming activity, see 58 Fed.Reg. 63,221 n. 4, all bar direct federal involvement in a nonconforming activity.) In other words, emissions that result from but are not directly produced by the federal action itself are covered by the statute only if that initial federal action constitutes federal "support" of the subsequent event or activity that actually produces the emissions in question.
 
 
 37
 As the EPA pointed out in the preamble to the final rule, the word "support" has a wide range of possible meanings, "from mere facilitation to continuing responsibility." 58 Fed.Reg. 63,221/3. Under the broadest definition of "support," the EPA noted, the prohibition in section 176(c)(1) "might be interpreted to include virtually all Federal activities, since all Federal activities could be argued to support, at least in some remote way, an action that ultimately emits pollution." 58 Fed.Reg. 63,221/2. Concluding that the Congress could not have intended "such egregious or absurd applications" of section 176(c)(1), id., the EPA settled upon a definition that "focuses on the extent to which the Federal agency has continuing program responsibilities, and whether it can practicably control emissions from its own and other party activities," 58 Fed.Reg. 63,221/3. This is certainly a reasonable interpretation, and therefore it is entitled to our deference.
 
 
 38
 Contrary to EDF's contention, the EPA's definition of indirect emissions is not inconsistent with the statutory definition of "conformity," which we quoted above. EDF maintains that the broad terms of subsection (B) of that provision require the agency to take into account all reasonably foreseeable emissions, whether produced by the federal action itself or by a subsequent action that is contingent upon the federal action having been taken. By the terms of the statute, however, an agency is required to ask whether an activity will "cause or contribute to any new violation" or "delay timely attainment" of an air quality standard only if the activity that produces the emissions will itself be supported in some way by the agency. The broad "cause or contribute" provision, therefore, pertains only to whether the federally supported activity itself would produce emissions not accounted for in the implementation plan, either at the time and place of the activity (direct emissions) or later or elsewhere (indirect emissions). See 58 Fed.Reg. 63,218/2 (indirect emissions must be included by virtue of "support in any way" criterion, not "cause and contribute" criterion).
 
 
 39
 By its terms, therefore, the statute prescribes a two-stage inquiry for federal agencies, and the EPA's regulations appropriately recognize and implement this structure. First, the agency is to determine whether it will be in some way supporting an activity that could potentially produce emissions. Second, the agency is to determine whether that activity conforms to the applicable implementation plan, which involves an inquiry into whether the activity would, inter alia, cause or contribute to a violation of an air quality standard. If the federal action leads to or facilitates a subsequent activity that could potentially produce emissions, the agency must again ask whether the action under consideration will be "supporting" that subsequent activity; if so, then the reasonably foreseeable emissions produced by the subsequent activity must also be taken into account as the indirect emissions of the agency action. The EPA's definition of "indirect emissions"--including only those reasonably foreseeable emissions that are within the continuing responsibility of the agency--is thus entirely consistent with the requirement that federally supported activities not cause or contribute to a violation.
 
 
 40
 Neither are we persuaded that the two other Clean Air Act provisions to which EDF refers us are evidence that the Congress intended that the general conformity rule be applied any more broadly than the EPA has applied it. First, EDF points to section 176(c)(2), the provision requiring conformity for transportation plans and projects, in which the Congress specifically required that the "emissions from motor vehicles" traveling on a new highway be included in the conformity determination for the highway construction project. 42 U.S.C. § 7506(c)(2)(A). Because the Congress clearly intended that motor vehicle traffic that is outside the continuing program responsibility of the Department of Transportation be included in the conformity determination, EDF argues, the Congress must also have intended the general conformity rule to extend beyond activities within the continuing control of the relevant agency. As we view this provision, however, it suggests the opposite point: the Congress referred explicitly to motor vehicle emissions in section 176(c)(2)(A) precisely because such emissions would not necessarily be included in the conformity determination by virtue of the provisions setting out the conformity requirements.
 
 
 41
 Second, EDF directs our attention to section 316(b) of the Act, which sets out the conformity requirements that apply to EPA grants for construction of sewage treatment plants. See 42 U.S.C. § 7616(b). This section explicitly authorizes the EPA to withhold or attach conditions to federal sewage treatment grants if the new sewage capacity would "reasonably be anticipated to cause or contribute to, directly or indirectly, an increase in emissions of any air pollutant in excess of the increase provided for under the provisions" of the applicable SIP, or if the new capacity "would otherwise not be in conformity with the applicable implementation plan." 42 U.S.C. § 7616(b)(3). The statute also specifies that in nonattainment areas the relevant SIP provisions must account for emissions "resulting directly or indirectly from areawide and nonmajor stationary source growth." 42 U.S.C. § 7616(b). According to EDF, the structure of this provision implies that the reasonably anticipated effects of the newly created treatment capacity are among the relevant factors in concluding whether the grant itself is in conformity. As the EPA explained, however, this provision is evidence that the Congress clearly intended a conformity review in this particular area. 58 Fed.Reg. 63,223/3. By specifically requiring the conformity analysis to be performed with respect to the capacity of the new sewage treatment plant, see 42 U.S.C. § 7616(b)(3), the Congress indicated that it was not satisfied in this area to limit conformity review to emissions caused by the construction of the plant, as it was for other types of federal construction permits or grants. Therefore, as with the transportation provision discussed above, we are not persuaded that this provision provides evidence that the Congress intended a broader application of the general conformity rule than the EPA's regulation indicates.
 
 VIII. EXEMPTION FOR NON-MAJOR FEDERAL ACTIONS
 
 42
 The EPA's general conformity regulations apply only to "major" sources of emissions. 58 Fed.Reg. 63,229/1. This limitation appears in the regulations in the form of tonnage thresholds of emissions, below which the conformity of the federal action is presumed. 40 C.F.R. §§ 51.853(b)(1), (c)(1), (g)(2). The regulations also identify certain categories of government action that are exempt from the conformity rule because the emissions increases they produce, if any, are de minimis. These exempt actions include judicial and legislative proceedings, recurring activities such as permit renewals where the activities to be conducted will be similar in scope and operation to activities already being conducted, rulemaking and policy development and issuance, routine maintenance and repair activities, civil and criminal law enforcement activities, actions related to foreign affairs, and so on. See 40 C.F.R. §§ 51.853(c)(2), (c)(3) (listing exempt actions).
 
 
 43
 EDF maintains that these exemptions and thresholds are in conflict with the statute. According to EDF, the broad prohibition in section 176(c)(1)--"[n]o department, agency, or instrumentality of the Federal Government shall engage in ... any activity"--shows that the Congress intended the general conformity requirement to apply to every activity of the federal government, however minor a source of emissions it may be. Moreover, the threshold levels adopted by the EPA are taken from the major stationary source definitions promulgated by the EPA for the use of states, in doing their SIPs, to determine which sources will be subject to review for compliance with air quality standards. Those levels were originally derived after a detailed analysis of the impact that a source over the threshold would have upon the attainment of the national standard for that particular pollutant. See 40 C.F.R. §§ 51.165, 51.166; 45 Fed.Reg. 52,705-10 (1980). In the present proceeding, argues EDF, the EPA has not and could not prove that these exemptions are truly de minimis: the cumulative effect of the exempted federal actions would produce at least some negative impact upon a state's prospects of attaining the national air quality standards.
 
 
 44
 As we explained in Alabama Power Co. v. Costle, 636 F.2d 323 (D.C.Cir.1979), categorical exemptions from the requirements of a statute may be permissible "as an exercise of agency power, inherent in most statutory schemes, to overlook circumstances that in context may fairly be considered de minimis." Id. at 360. This principle derives from the commonplace notion that "the law does not concern itself with trifling matters." Id. The ability to create a de minimis exemption "is not an ability to depart from the statute, but rather a tool to be used in implementing the legislative design." Id.
 
 
 45
 Of course, as EDF points out, a de minimis exemption cannot stand if it is contrary to the express terms of the statute. See, e.g., Public Citizen v. Young, 831 F.2d 1108, 1122 (D.C.Cir.1987) (rejecting agency's attempt to create de minimis exemption for certain chemicals that caused cancer in animals but posed only minuscule risk to humans, because statute barred listing of chemicals causing cancer "in man or animal"); Sierra Club v. EPA, 992 F.2d 337, 343-45 (D.C.Cir.1993); Kokechik Fishermen's Ass'n v. Secretary of Commerce, 839 F.2d 795, 801-02 (D.C.Cir.1988). As long as the Congress has not been "extraordinarily rigid" in drafting the statute, however, "there is likely a basis for an implication of de minimis authority to provide [an] exemption when the burdens of regulation yield a gain of trivial or no value." Alabama Power, 636 F.2d at 360-61; see also Public Citizen v. FTC, 869 F.2d 1541, 1556-57 (D.C.Cir.1989) (doctrine permits exemptions when application of statute would have no benefit, not merely when agency concludes that costs exceed benefits). For example, in State of Ohio v. EPA, 997 F.2d 1520 (D.C.Cir.1993), we upheld the EPA's recognition of a de minimis exemption from a statute requiring periodic review of certain Superfund sites; the EPA's regulation required periodic review only of sites where hazardous substances remained at levels precluding unrestricted use of and exposure to the site, thus exempting the sites at which a nonhazardous amount remained. The exemption stood because the Congress had not set out its requirement for periodic review in rigid terms: the statute requiring periodic review for a site at which "any hazardous substances" remain, we concluded, could easily be referring to "even one" hazardous substance, as opposed to "any amount of any hazardous substance." Id. at 1534-35. Moreover, we noted in that case, as we had in Public Citizen v. Young, that "the literal meaning of a statute need not be followed where the precise terms lead to absurd or futile results, or where failure to allow a de minimis exemption is contrary to the primary legislative goal." Id. at 1535. Because the EPA's regulation avoided a "mammoth monitoring burden" and yet "square[d] with the health-protective purpose of the statute," we concluded that to require a different result would be "to adjudge Congress incompetent to fashion a rational legislative design." Id. at 1534-35.
 
 
 46
 In this case, as in Ohio v. EPA, we do not think that the Congress has taken a position so rigid that it will not admit of a de minimis exemption. Although the terms of the statute do prohibit the federal government from engaging in "any activity" that is not in conformity, it seems eminently reasonable for the EPA to interpret this provision to refer to "any activity" that is likely to interfere with the attainment goals in a SIP--that is, to major federal actions and to lesser actions that could still produce a regionally significant level of emissions. See 40 C.F.R. §§ 51.853(b), (i); 58 Fed.Reg. 63,229/1 (applying conformity requirements to de minimis actions would generate "vast numbers of useless conformity statements"). The purpose of section 176(c)(1), after all, is not to minimize emissions but to ensure that federal actions conform with state implementation plans. 58 Fed.Reg. 63,215/2. Moreover, we find nothing in the statute to preclude the EPA's identification of categories of federal action that would produce either no or a trivial level of emissions; these activities by definition could not threaten a state's attainment of the goals in its SIP. Although a series of de minimis federal actions, taken together, could conceivably effect a significant environmental harm, the EPA appropriately did not consider the cumulative effect of the exempted federal actions; the statute requires each individual federal activity to be in conformity with the SIP and does not demand a mechanism that would evaluate the emissions of various federal activities in the aggregate.
 
 
 47
 EDF contends, in the alternative, that the EPA's ability to create de minimis exemptions is conditioned upon its providing a higher level of justification than it gave in this case. In Alabama Power, it is arguable, we indicated that a high level of justification is indeed necessary to support a de minimis exemption. See 636 F.2d at 360 ("Determination of when matters are truly de minimis naturally will turn on the assessment of particular circumstances, and the agency will bear the burden of making the required showing"). We decided Alabama Power, however, before the Supreme Court's decision in Chevron, which clarified the degree to which a reviewing court should defer to an agency acting within the scope of its delegated authority, whether implicit or explicit. To the extent that both Chevron and Alabama Power address agency power inherent in a statutory scheme, the same deference due to an agency's reasonable interpretation of an ambiguous statute may also be due to an agency's creation of a de minimis exemption. Thus, in Ohio v. EPA we upheld a de minimis exemption after finding it to be "permissible" under the statute--the same standard applied by the Supreme Court in the second step of the Chevron analysis. See Ohio, 997 F.2d at 1535; Chevron, 467 U.S. at 843, 104 S.Ct. at 2781-82; see also Western Nebraska Resources Council v. EPA, 943 F.2d 867, 870 (8th Cir.1991) (upholding exemption as "permissible" construction of statute, and citing both Alabama Power and Chevron). But see Natural Resources Defense Council, Inc. v. EPA, 966 F.2d 1292, 1306 (9th Cir.1992) (rejecting de minimis exemption because of "lack of data" to show that regulation would be of "trivial or no value").
 
 
 48
 In this case, however, we need not resolve whether, under Chevron, an agency may create a de minimis exemption with a justification less rigorous than we indicated in Alabama Power, because the EPA has adequately explained itself even by the standard of the latter case. The tonnage requirements that the EPA adopted in the final rule are taken from the major stationary source definitions because these thresholds are a reasonable measure of the level of emissions that would result from a major federal action, and that limitation is entirely reasonable given the aforementioned futility and wastefulness of applying the conformity requirements to all federal actions, however minor. 58 Fed.Reg. 63,228-29. When the EPA chose to deviate from these standards by prescribing a lower tonnage threshold for lead, it explained that this adjustment was required because even relatively small increases in lead emissions, as compared to other pollutants, may threaten a state's ability to attain the national standards for lead. 58 Fed.Reg. 63,229/1. Given that the tonnage requirements in this context serve only to ensure conformity with SIPs and do not purport to distinguish between those federal actions that are harmful to the environment and those that are not, a more specific analysis linking the actual threshold levels with the goal of public health was not necessary.
 
 
 49
 Finally, that the categorical exemptions are de minimis is entirely self-evident; the EPA has concluded that these activities "would result in no emissions increase or an increase in emissions that is clearly de minimis," 40 C.F.R. § 51.853(c)(2), and we neither see nor would expect to find any evidence to the contrary. The brevity of the EPA's explanations therefore does not preclude us from affirming these provisions as an appropriate exercise of the EPA's authority, inherent in the statutory scheme, to create de minimis exemptions.
 
 IX. CONFORMITY WITH PROMISED SIP REVISIONS
 
 50
 The EPA's general conformity rule permits an agency to approve an activity when it conforms not with the SIP currently in place but with the SIP as it will be when the state carries out a commitment to revise it; in other words, the regulation permits a state to change its SIP to accommodate a federal action, as long as the state complies with certain safeguards intended to ensure that the revision is actually forthcoming. See 40 C.F.R. § 51.858(a)(5)(i)(B). EDF argues that this provision is contrary to the Congress's command that federally supported activities conform to "an implementation plan after it has been approved or promulgated under section 7410 of this title." 42 U.S.C. § 7506(c)(1).
 
 
 51
 EDF did not present this argument during the rulemaking proceedings. The provision at issue, however, was not included in the proposed rule, so EDF would have had to present its argument, if at all, in a petition for reconsideration. Because the Clean Air Act, unlike some others, does not require exhaustion of all available remedies, compare, e.g., National Labor Relations Act, 29 U.S.C. § 160(e) with Clean Air Act, 42 U.S.C. § 7607(b)(1), EDF's failure to bring a petition for reconsideration does not preclude our hearing its argument. Cf. Darby v. Cisneros, 509 U.S. 137, 152-54, 113 S.Ct. 2539, 2548, 125 L.Ed.2d 113 (1993) (holding § 10(c) of APA, similar in substance to Clean Air Act, precludes court from requiring litigants "to exhaust optional appeals"); Ciba-Geigy Corp. v. EPA, 46 F.3d 1208, 1210 n. 2 (D.C.Cir.1995). Although in a more fact-intensive case we might invoke the prudential doctrine of ripeness and remand to the agency an issue raised here in the first instance, see, e.g., Ciba-Geigy, 46 F.3d at 1210, we do not think that is necessary in this case.
 
 
 52
 The plain meaning, if there is one, controls our interpretation of a statute "except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). This is one of those rare cases. This case requires a more flexible, purpose-oriented interpretation if we are to avoid "absurd or futile results." Alabama Power v. Costle, 636 F.2d 323, 360 n. 89 (D.C.Cir.1979) (quoting United States v. American Trucking Ass'ns, 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940)).
 
 
 53
 Section 176(c) of the Clean Air Act was adopted as one part of a larger regulatory program through which federal and state governments work together to control air pollution. While the air quality standards are developed by the EPA, see 42 U.S.C. § 7409, the Congress directed each state to develop and submit for the EPA's approval a state implementation plan containing the state's strategies for achieving the air quality standards, see 42 U.S.C. § 7410. Section 176(c)(1) was enacted to prevent federal activities from interfering with the efforts of a state to attain the goals set out in its SIP. As the EPA explains, "[t]his integration of Federal actions and air quality planning is intended to protect the integrity of the SIP by helping to ensure that SIP growth projections are not exceeded, emissions reduction progress targets are achieved, and air quality attainment and maintenance efforts are not undermined." 58 Fed.Reg. 63,215/2.
 
 
 54
 Read literally, section 176(c)(1) of the Clean Air Act requires that a federal action conform to the implementation plan that is currently in place, not to a revised plan that has yet to be examined and approved by the EPA. See 58 Fed.Reg. 63,237-38 ("The plain language of the statute does not allow the flexibility suggested" by the comment proposing that conformity determinations be based upon the most recent SIP revisions submitted to EPA). When the state expresses a willingness to revise its SIP specifically to account for the emissions that will arise from a proposed federal action, the literal terms of the statute would prevent the federal action from proceeding until such time as a full-fledged SIP revision could be developed, submitted, and approved. The result would be to frustrate the process of state and federal cooperation and the integrated planning that section 176(c)(1) was created to foster; this rigid application of the conformity rule would block a federal action that the state desires and promises to accommodate through the appropriate adjustments to levels of emissions from other sources. Because this literal reading of the statute would actually frustrate the congressional intent supporting it, we look to the EPA for an interpretation of the statute more true to the Congress's purpose.
 
 
 55
 As the EPA explained in its preamble to the final rule, section 51.858(a)(5)(i) of the regulations "is consistent with the congressional desire to assure that State plans are not undermined by Federal actions; thus, where the State voluntarily commits to revise its SIP so that a Federal action conforms, that action would not undermine the State's decision-making ability and should be allowed to conform." 58 Fed.Reg. 63,236/1. The circumstances in which this provision applies are quite narrow; in order to ensure that the SIP will indeed be revised as promised, a commitment "must be made by the Governor or Governor's designee for submitting SIP revisions and must provide for revision of the SIP so that emissions from the Federal action would conform to the SIP emission budget in a time period consistent with the time that emissions from a Federal action would occur." Id. This commitment must include, inter alia, a specific schedule for SIP revision, identification of specific accommodation measures that would be taken, and written documentation to support the conformity determination. Given these safeguards, as well as the enforcement power wielded by the EPA, see 40 C.F.R. § 51.858(a)(5)(i)(C); 42 U.S.C. § 7509, we find that the regulation is reasonable, narrowly drawn, consistent with the purpose of the Act, and therefore within the EPA's discretion.
 
 
 56
 For the preceding reasons, the petitions for review are
 
 
 57
 Denied.
 
 
 
 [1]
 These are the Environmental Defense Fund, Inc., the Sierra Club, the Natural Resources Defense Fund, Inc., the Conservation Law Foundation, the Oregon Environmental Council, and the Delaware Valley Citizens Council for Clean Air
 
 
 [2]
 The Agency has always construed the conformity requirement to apply only to "nonattainment" areas (those that have not attained a national ambient air quality standard for a particular pollutant) and to maintenance areas (former nonattainment areas that have attained the standard). See 40 C.F.R. §§ 51.394(b), 51.853. Petitioners stated, in their nonbinding statement of issues on review in this court, that this was one aspect of the rules on which it would petition for review. Argument as to this aspect was not included in petitioners' briefs and therefore has not been raised in this court. Apparently, petitioners prevailed in the Northern District of California on a claim that the Agency failed to take statutorily required action when it extended coverage of the conformity rules only to nonattainment areas. We understand that this case is on appeal in the Ninth Circuit. Intervenors American Road and Transportation Builders Association and American Trucking Associations, Inc. moved this court for a writ to protect our jurisdiction over this issue, said by intervenors to be exclusive under the statute. In the meantime, Congress has amended the Clean Air Act to make clear that the conformity requirements extend only to nonattainment or maintenance areas. See National Highway System Designation Act of 1995, Pub.L. No. 104-59, § 305(b), 109 Stat. 568, 580 (1995). We assume that Congress' action renders intervenors' concerns moot
 
 
 [3]
 Under 23 U.S.C. § 134(b) and 49 U.S.C. § 5303(c)(1), a metropolitan planning organization must be designated to develop transportation plans and programs for each urban area with a population of at least 50,000
 
 
 [4]
 For the statutory definition of "conformity," see infra Part VII (quoting 42 U.S.C. § 7506(c)(1))
 
 
 [5]
 The long range plan, to be updated "periodically," must (1) identify transportation facilities "that should function as an integrated metropolitan transportation system," (2) provide for financing implementation of the plan, (3) assess capital investment and other measures necessary to preserve and make the most efficient use of existing metropolitan transportation facilities and (4) provide for "transportation enhancement activities." The TIP, to be updated "at least once every 2 years," must include a priority list of transportation projects to be conducted each triennium and a plan for financing the projects. 23 U.S.C. § 134(g), (h); 49 U.S.C. §§ 5303(f), 5304(a)-(b)
 
 
 [6]
 Subsection (c)(2) provides:
 (A) no transportation plan or transportation improvement program may be adopted by a metropolitan planning organization designated under Title 23 or the Urban Mass Transportation Act, or be found to be in conformity by a metropolitan planning organization until a final determination has been made that emissions expected from implementation of such plans and programs are consistent with estimates of emissions from motor vehicles and necessary emissions reductions contained in the applicable implementation plan, and that the plan or program will conform to the requirements of paragraph (1)(B);
 (B) no metropolitan planning organization or other recipient of funds under Title 23 or the Urban Mass Transportation Act shall adopt or approve a transportation improvement program of projects until it determines that such program provides for timely implementation of transportation control measures consistent with schedules included in the applicable implementation plan;
 (C) a transportation project may be adopted or approved by a metropolitan planning organization or any recipient of funds designated under Title 23 or the Urban Mass Transportation Act, or found in conformity by a metropolitan planning organization or approved, accepted, or funded by the Department of Transportation only if it meets either the requirements of subparagraph (D) or the following requirements--
 (i) such a project comes from a conforming plan and program;
 (ii) the design concept and scope of such project have not changed significantly since the conformity finding regarding the plan and program from which the project derived; and
 (iii) the design concept and scope of such project at the time of the conformity determination for the program was adequate to determine emissions.
 (D) Any project not referred to in subparagraph (C) shall be treated as conforming to the applicable implementation plan only if it is demonstrated that the projected emissions from such project, when considered together with emissions projected for the conforming transportation plans and programs within the nonattainment area, do not cause such plans and programs to exceed the emission reduction projections and schedules assigned to such plans and programs in the applicable implementation plan.
 42 U.S.C. § 7506(c)(2)(A)-(D).
 
 
 [7]
 The general conformity regulation provides:
 (a) No department, agency or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve any activity which does not conform to an applicable implementation plan.
 (b) A Federal agency must make a determination that a Federal action conforms to the applicable implementation plan in accordance with the requirements of this subpart before the action is taken.
 
 
 [40]
 C.F.R. § 51.850(a)-(b). The transportation conformity regulation provides:
 (a) Action applicability.
 (1) Except as provided for in paragraph (c) of this section or § 51.460, conformity determinations are required for:
 (i) The adoption, acceptance, approval or support of transportation plans developed pursuant to 23 CFR part 450 or 49 CFR part 613 by [a metropolitan planning organization] or [the Department of Transportation];
 (ii) The adoption, acceptance, approval or support of TIPs developed pursuant to 23 CFR part 450 or 49 CFR part 613 by [a metropolitan planning organization] or [the Department of Transportation]; and
 (iii) The approval, funding, or implementation of FHWA/FTA projects.
 
 
 [40]
 C.F.R. § 51.394(a)
 
 
 [8]
 The general regulation provides:
 (c) Paragraph (b) of this section does not include Federal actions where ...:
 (1) A National Environmental Policy Act (NEPA) analysis was completed as evidenced by a final environmental assessment (EA), environmental impact statement (EIS), or finding of no significant impact (FONSI) that was prepared prior to January 31, 1994;
 ....
 
 
 [40]
 C.F.R. § 51.850(c)(1). The transportation regulation provides:
 (c) Limitations. (1) Projects subject to this regulation for which the NEPA process and a conformity determination have been completed by FHWA or FTA may proceed toward implementation without further conformity determinations if one of the following major steps has occurred within the past three years: NEPA process completion;....
 
 
 [40]
 C.F.R. § 51.394(c)(1)
 
 
 [9]
 The Agency has construed a "TCM" to mean "any measure that is directed toward reducing emissions of air pollutants from transportation sources." 40 C.F.R. § 51.100(r). "Such measures include, but are not limited to, those listed in section 108(f) of the Clean Air Act." Id. Section 108 describes various possible TCMs that reduce vehicle emission concentrations by, for example, providing incentives for mass transit, car-pooling and nonmotorized travel. See 42 U.S.C. § 7408(f)(1)(A)
 
 
 [10]
 Petitioners acknowledge that this concern exists only in the Action/1990 comparison. It does not affect the Action/Baseline comparison as these reductions appear on both sides of that equation
 
 
 [11]
 Petitioners quote from what they call the "conference report" to bolster their argument that the contribution to emissions reductions must be sufficient to realize the required 15% reduction: "[T]he sponsors intend that the mobile source contribution to overall emissions in the nonattainment areas b[e] reduced annually at the same percentage rate that would apply for the development of a SIP." 136 CONG. REC. S16,973 (Oct. 27, 1990) (remarks of Sen. Baucus). This document, inserted in the Congressional Record by Senator Baucus, and entitled "Clean Air Act Amendments of 1990 Chafee-Baucus Statement of Senate Managers," was described by Senator Baucus as having "not been reviewed or approved by all of the conferees." Id. at S16,933. The report of the House and Senate conference committee on the Clean Air Act amendments is H.R. CONF. REP. NO. 952, 101st Cong., 2d Sess. (1990), U.S. Code Cong. & Admin. News 1990, p. 3385, which contains no discussion of this issue. The statement of Senator Baucus is certainly probative of congressional intent as to the amount of emissions reduction that must be proved, but cannot undermine the statute's language or the explicit delegation to the Agency of the task of setting forth conformity criteria. See, e.g., Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979)
 
 
 [12]
 Of course, as the Agency noted in its notice of proposed rulemaking, a state may decide in the course of revising its SIP that it wants to achieve the necessary reductions strictly through reducing motor vehicle emissions without reducing stationary source emissions. 58 Fed.Reg. 3782 (1993)
 
 
 [13]
 Petitioners argued in their reply brief that requiring conformity determinations for state transportation improvement programs would "ensur[e] conformity in those smaller nonattainment areas that lack" metropolitan planning organizations. We think that the Agency's complex of rules dealing with transportation projects in such areas ensures that petitioners' concern is adequately addressed. See 40 C.F.R. § 51.452(d); see also 58 Fed.Reg. 62,207-08
 
 
 [14]
 The Agency appreciated the possible disconnect between the receipt of highway funds on the one hand and other activities on the other, and concluded that Congress specified recipients of highway funds in their capacity as recipients of highway funds. See 58 Fed.Reg. 3768, 3772 (1993)
 
 
 [15]
 Although Congress has not explicitly defined "intermodal," we take it to mean "between or among modes." See, e.g., WEBSTER'S THIRD INTERNATIONAL DICTIONARY, 1176 (1971)
 
 
 [16]
 In its notice of proposed rulemaking, the Agency described the effect of § 51.858(a)(5)(ii) as providing "that vehicular activity from a Federal action may be determined to conform with the air quality criteria if the Federal action and its vehicular activity is specifically included in the conforming transportation plan and transportation improvement program for the area." 58 Fed.Reg. 13,836, 13,845 (1994) (emphasis added). Since "vehicular" is best understood in this sentence as the adjectival form of "motor vehicle"--a term used throughout the rulemaking and apparently understood by Congress as well as all participants to the rulemaking to mean vehicles of the sort that travel on highways (as opposed to "any motorized conveyance")--we think it is clear that the Agency perceives this supposed loophole in its regulation as limited to the sorts of Federal activities that involve motor vehicles and would be involved in transportation plans and programs: highway or transit projects